# IN RE APPEAL OF RUSSELL LEGO v. GERTRUDE ROLFE AND OTHERS.

129 N. W. (2d) 811.

July 17, 1964—Nos. 38,990 to 38,995, 39,075 to 39,077.

*Gordon Rosenmeier* and *John E. Simonett,* for appellants.

*Peter S. Popovich* and *Peterson & Popovich,* for respondent district No. 115.

*LeVander, Gillen, Miller & Durenberger,* for respondent district No. 118.

*Frank Hammond* and *Briggs & Morgan,* for Independent School District No. 119, amicus curiae.

KNUTSON, CHIEF JUSTICE.

This is a consolidation of six appeals from an order denying a new trial and from orders upholding three consolidations of the Unorganized Territory of Cass County with existing school districts.

No attempt will be made to recite the facts in detail. The Unorganized Territory of Cass County is a sprawling, sparsely settled area of the state, dotted by lakes, and in a measure surrounding Leech Lake, which is one of the larger lakes of the state. Originally, the Unorganized Territory consisted of a larger area than it does today, but over the years parts of it have been attached to existing school districts. Roughly, it now consists of about one-third of the land area of Cass County and, according to a study made by the Department of Education of the University of Minnesota, consists of 802 sections of land. All told, it has less than 700 pupils of school age, or less than one pupil per section of land. Over the years it has operated some elementary schools and three secondary schools. The secondary school at Boy River consisted of three rooms and three teachers for the entire high school,[1] but this school has now been discontinued. The children of high school age within the Unorganized Territory, for the most part, have been educated in high schools operated by organized school districts at Cass Lake, Walker, and Remer.

For many years, efforts have been made to solve the school prob-

---

[1]See record and briefs in Edwards v. Mettler, 268 Minn. 472, 129 N. W. (2d) 805, considered and decided with this case.

lems of this area. Proposals, no matter what they were, have met with opposition from proponents of some other solution than that proposed. A great deal of litigation has resulted, both in the trial courts and in this court. Since 1955, litigation has been pending almost continuously somewhere.[2] Except in Cass County, unorganized territory, under the laws of this state, is governed by a board of education consisting of the county superintendent of schools, the county treasurer, and the chairman of the board of county commissioners.[3] Recognizing the vast area involved in the Unorganized Territory of Cass County, the legislature, since 1941, has permitted the people of the Unorganized Territory to elect the chairman of its Board of Education. In 1957, the legislature enlarged the board of this territory so as to permit the people to elect three members.[4] The constitutionality of this act was upheld in Williams v. Rolfe, 262 Minn. 284, 114 N. W. (2d) 671, where we discussed many of the school problems peculiar to the Unorganized Territory of Cass County.

High schools are maintained by organized school districts in the villages of Cass Lake, Walker, and Remer, among other places in Cass County. The children of high school age in the northeast part of the Unorganized Territory of Cass County, for the most part, have been educated by the school district maintaining a high school in Cass Lake for many years. This area has been referred to in the proceedings as the Bena area and will be so referred to herein. The children in the southern part of the territory, referred to as Hackensack, of high school age have attended school in Walker. The central part of the territory,

---

[2] See, for instance, the cases in this court: State ex rel. Hanson v. Mettler, 252 Minn. 30, 89 N. W. (2d) 168, upholding the appointment of Mettler as a member of the board of education pending an appeal; Williams v. Rolfe, 257 Minn. 237, 101 N. W. (2d) 923, denying an injunction against the county superintendent; Marine v. Whipple, 259 Minn. 18, 104 N. W. (2d) 657, denying a writ of prohibition; Williams v. Rolfe, 262 Minn. 284, 114 N. W. (2d) 671, upholding the constitutionality of L. 1957, c. 730; In re Appeal of Williams, 263 Minn. 581, 116 N. W. (2d) 589, dismissing an appeal from an order denying summary judgment.

[3] Minn. St. 123.56.

[4] See, L. 1957, c. 730.

referred to as the Federal Dam-Boy River-Longville area, which will be referred to herein as the Longville area, has for the most part sent its high school pupils to Remer.

In 1955, Hackensack, Bena, and Longville proceeded with petitions to form independent school districts. These proceedings were held invalid by the district court for the reason that they would have left a part of the Unorganized Territory without schools or the ability to establish them.

Early in May 1959, a petition was filed with the county superintendent of schools for the consolidation of the Hackensack area with Walker. Prior thereto, the board of the Unorganized Territory had entered into a contract with the Board of Regents of the University of Minnesota to have a survey of the Unorganized Territory made by the Bureau of Field Studies of the College of Education for the purpose of appraising the educational needs and facilities of the territory and making recommendations to the board as to what action should be taken to meet the educational problems of the territory. Late in May, the county superintendent prepared a plat of the proposed consolidation of Hackensack with Walker, filed it with the county auditor, and sent the plat and a supporting statement to the commissioner of education of the State of Minnesota.

Late in May, another petition to consolidate the Bena area with the Cass Lake district was circulated and filed with the county superintendent of schools. On June 4, 1959, she made a plat of this proposal and filed it with the county auditor and sent the necessary copy and a supporting statement to the commissioner of education. Much legal skirmishing followed,[5] which we need not detail here, and further action on the proposed consolidations was thereby delayed.

When the way was clear for her to do so, the county superintendent of schools, on her own initiative, prepared a third plat proposing to consolidate the balance of the territory included in these proceedings with the Remer school district. Ultimately, all three plats were approved by the commissioner of education and the board of the Unorganized

---

[5]See, for instance, Williams v. Rolfe, 257 Minn. 237, 101 N. W. (2d) 923.

Territory. They were thereafter approved by the school districts of Walker, Cass Lake, and Remer. Notice of the action taken was published in the official proceedings of the various school boards involved.

Petitions thereafter were filed by freeholders requesting referendums on the Walker-Hackensack consolidation and the Longville-Remer consolidation. No referendum was requested as to the Cass Lake-Bena consolidation. These petitions were not granted by the county superintendent of schools on the ground that there was no statutory authority for such referendums.

Appeals were taken to the district court from all of the consolidations after the county superintendent had filed her final certificate. After a lengthy trial and after the court had filed its findings of fact, conclusions of law, and orders for judgment affirming the consolidations, new members of the Board of Education of the Unorganized Territory were elected in 1962 and took office in January 1963. By a vote of three to two, the board as then constituted adopted a resolution seeking to rescind the action taken by its predecessor approving the consolidations. It then applied for leave to intervene in the action and to be permitted to reopen the case so as to introduce the resolutions rescinding the action of the prior board which had approved the consolidations. The trial court offered to permit the board to intervene if it would accept the case as it found it. This the board declined to do. The court then denied the motion to reopen the case.

Appeals were perfected to this court from the trial court's orders approving the consolidations and from an order denying a new trial. The Remer school district has been permitted to intervene and supports the trial court's decision. The Walker school district has appeared in this court as amicus curiae and also supports the consolidations.

The questions raised here are: (1) Was the request for a referendum by freeholders in the Hackensack and Longville areas properly denied? (2) May a school board, after all steps necessary to effect a consolidation have been completed, rescind the action so taken? (3) Was the action taken by the school boards for these consolidations so arbitrary, capricious, oppressive, or unreasonably against the best in-

terests of the territory affected as to justify a court in setting them aside?

■ Appellants sought summary judgment in the Walker and Remer cases for the reason that the board had failed to call an election with respect to these areas. Appellants contend that such election is required under Minn. St. 122.23, subd. 9. Subdivisions 8, 9, and 10 must be read together in order to ascertain the legislative intent with respect to the necessity for calling such election. In construing these statutes, other statutory provisions containing definitions are of importance. Section 122.01 reads:

"For purposes of this chapter, the words defined in section 120.02, have the same meaning."

By reference to § 120.02, we find that subd. 3 thereof provides:

" 'District' means a school district."

Section 120.02, subd. 13, defines a common school district; subd. 14, an independent district; subd. 15, a special school district; and subd. 16, an associated district. We come then to subd. 17, which reads:

" 'Unorganized territory' is the portion of a county not included in organized districts, and includes territory heretofore ceded to the government of the United States. Unorganized territory is a public corporation."

From these definitions it is apparent that unorganized territory is not a district within the meaning of these statutory provisions. The fact that it is unorganized distinguishes it from a district. This is further emphasized by § 122.02, which provides:

"School districts shall be classified as common, independent, special or associated districts, each of which is a public corporation. * * *"

Nowhere do we find that the legislature intended to consider unorganized territory a school district. In construing similar language in a former statute in School Dist. No. 30 v. Consol. School Dist. No. 30, 151 Minn. 52, 56, 185 N. W. 961, 963, we said:

"* * * The word 'district' occurs in it [the statute] in many places

and always in connection with or by way of reference to a school district * * *. We think the word is not used in a different sense in the proviso. As a general rule the words of a statute are to be construed with reference to the words with which they are associated, * * *. We are of the opinion that the word 'district' in the second proviso is used in the same sense as in the first proviso and refers to a school district."

We come then to a consideration of § 122.23, subds. 8, 9, and 10, dealing with consolidations. Subd. 8 reads:

"The board of any independent district maintaining a secondary school, the board of any common district maintaining a secondary school, or the board for unorganized territory, all or part of whose land is included in the proposed new district, shall, within 45 days of the approval of the plat by the commissioner, either adopt or reject the plan as proposed in the approved plat. If the board of any such district or unorganized territory entitled to act on the petition rejects the proposal, the proceedings are terminated and dismissed. If any board fails to act on the plat within the time allowed, the proceedings are terminated."

It is noticeable that in this subdivision the legislature definitely referred to unorganized territory but, in so doing, it referred to a district as something separate and distinct from unorganized territory. Subd. 9 reads:

"If the approved plat contains land area in more than one independent district maintaining a secondary school, or common district maintaining a secondary school, and if each board entitled to act on the plat approves the plat, each such board shall cause notice of its action to be published at least once in its official newspaper. If five percent of the resident freeholders *of any such district* shall petition the clerk of the district, within 30 days after the publication of such notice, for an election on the question, the consolidation shall not become effective until approved by a majority vote in such district at an election held in the manner provided in subdivisions 11, 12 and 13 of this section." (Italics supplied.)

Here it is noticeable that no reference is made to unorganized territory at all. Subd. 10 reads:

"If an approved plat contains land area in any district not entitled to act on approval or rejection of the plat by action of its board, the plat may be approved by the residents of such land area within 60 days of approval of plat by commissioner in the following manner:

"A petition calling upon the county superintendent to call and conduct an election on the question of adoption or rejection of the plat may be circulated in such land area by any person residing in such areas. Upon the filing of such petition with the county superintendent, executed by at least 25 percent of the resident freeholders in each district or part of a district contained in such land area, the county superintendent shall forthwith call and conduct a special election of the electors resident in the whole land area on the question of adoption of the plat. For the purposes of this section, the term 'electors resident in the whole land area' means and shall be construed to include any person or persons residing on any remaining portion of land, a part of which is included in the consolidation plat. Any freeholder owning land included in such plat who lives upon land adjacent or contiguous to that part of his land included in such plat shall be included and counted in computing the 25 percent of the resident freeholders necessary to sign such petition and shall also be qualified to sign such petition. Failure to file such petition within 60 days of approval of plat by the commissioner terminates the proceedings."

Here, again, there is no reference to unorganized territory.

Appellants rely upon that part of subd. 9 which provides:

"* * * If five percent of the resident freeholders of *any such district* shall petition the clerk of the district * * * for an election on the question, the consolidation shall not become effective until approved by a majority vote in such district * * *." (Italics supplied.)

It is the contention of appellants that the words "any such district" refer back to the districts, including unorganized territory, mentioned in subd. 8. It seems clear to us that such construction is untenable. The words "such district" refer back to the districts last mentioned in

subd. 9, which does not include unorganized territory. This is further emphasized by reference to subd. 8. There, where similar language is used, we find reference to both the described districts and unorganized territory. It reads:

"* * * If the board of any such district or unorganized territory entitled to act on the petition rejects the proposal, the proceedings are terminated and dismissed."

If the legislature had intended to include unorganized territory in subd. 9, it would seem it would have referred to both districts and unorganized territory, as it did in subd. 8.

It has long been held that the legislature can prescribe the process by which school districts may be organized, reorganized, or consolidated. It may delegate its legislative powers to carry out such action to a board or boards, and such board or boards may not redelegate the power so granted. Where an election is not provided by the legislature, none can be provided by the board to which is delegated the power and duty to effect consolidation. In Muehring v. School Dist. No. 31, 224 Minn. 432, 437, 28 N. W. (2d) 655, 658, we said:

"Where there is no statutory authorization for submission of a question to the voters for their decision, such a submission by a public authority clothed with power with respect to the question submitted constitutes an unauthorized redelegation of delegated power. In such a case, because the voters lack power with respect to the question submitted and because the public authority lacks the power to confer it upon them, submission of the question to the voters is without legal effect, and their decision is in no way controlling or binding."

Inasmuch as unorganized territory is not given the right to approve or reject a consolidation by an election, the court was correct in holding that there was no right to hold such election.

■ After these appeals had been tried in the district court and decisions upholding the consolidations filed, but prior to determination of a motion for a new trial, as a result of an election in 1962 three of the five members of the board of the Unorganized Territory opposed the

consolidations and adopted resolutions purporting to rescind the action theretofore taken approving the consolidations. The board thereafter applied to the court for leave to intervene in order to interpose the attempted rescission as ground for a reversal. The trial court offered to permit the intervention if the board would take the case as it found it up to that point. This it refused to do. Appellants now urge as error the trial court's denial of the motions to reopen and to permit intervention in order to interpose the alleged rescission.

The right to intervene is claimed under § 127.25, subd. 2, which reads:

"Any school district or any person affected by final order of the county board or final order of the commissioner or final order of the county superintendent shall be permitted to intervene in appeals under this section as a party respondent."

This provision came into our laws by the codification of our school laws in 1959. It had no counterpart in the 1957 statutes. Compare Minn. St. 1957, § 122.051, with Ex. Sess. L. 1959, c. 71, art. VIII, § 25 (Minn. St. 127.25). It was intended to give a party benefited by the order a chance to appear in the action and uphold it. Accordingly, the provision permits a school board or party to intervene *as a respondent*.[6] A respondent can hardly encompass one who seeks to at-

---

[6]The comment of the Education Laws Commission found in Tentative Draft of Laws Relating to Elementary and Secondary School Education (July 1958), p. 127, reads:

"Another matter raised in connection with the appellate procedure is the idea of intervention. That is, upon an appeal from an order of a county board, or the commissioner, or the county superintendent, the law is not clear as to who represents the position of the board, commissioner, or superintendent. It is usually the case that the petitioners or parties benefitted by the order will be interested in appearing and upholding the action of a board, and the commission feels that these parties should be allowed to appear in the action and to represent their position before the court. The present rules of civil procedure do not adequately cover this situation, and the cases are not clear as to the right of intervention. To secure this right to the proper parties, subdivision 2 of the proposed draft is recommended for adoption."

tack the order. Aside from such statutory intervention, the trial court would have discretionary power to permit intervention, but ordinarily such an intervenor would take the case as he finds it and may not raise new issues.[7] The conditions upon which intervention will be allowed rest largely within the discretion of the trial court. Here, whether it should be allowed depends largely on whether the board of the Unorganized Territory could rescind what its predecessor had done after the consolidation was an accomplished fact and pending determination of an appeal. On this issue, it appears clear that the attempted rescission was ineffective. When the commissioner of education, the board of the Unorganized Territory, and the boards of the various districts with which parts of the Unorganized Territory were to be consolidated had approved plats and the final certificate had been filed by the superintendent, the consolidations were complete, subject only to such judicial review as is available. It is true that we have adopted as a matter of public policy a rule that, pending determination of an appeal, a consolidation is suspended in order to maintain the status quo. The purpose of such suspension has been adequately stated in many prior cases. In Sullivan v. Joint Ind. Consol. School Dist. No. 102, 251 Minn. 378, 385, 88 N. W. (2d) 1, 6, for instance, we said:

"* * * Pending an appeal, schools must function, and as a practical matter it has been determined that it is better to keep matters in status quo until the appeal has been determined than to permit the newly organized district to take over and perform functions which might become invalid on a determination of the appeal."

The consolidation is nonetheless an accomplished fact, and, unless it is judicially determined to be invalid, no further act is necessary to make it complete. The functions of the various boards have been performed. To permit a new board to upset what has been accomplished by this procedure would lead to nothing but chaos. Here, the appeal had actually been determined adversely to appellants prior to the time

---

[7]Mondale v. Commr. of Taxation, 263 Minn. 121, 116 N. W. (2d) 82; Twin City Milk Producers Assn. v. Oase, 199 Minn. 124, 271 N. W. 253; State ex rel. Jackson v. Willson, 230 Minn. 156, 40 N. W. (2d) 910. See, also, United States v. Northern Securities Co. (D. Minn.) 128 F. 808.

when the new board attempted to act. While motions for a new trial had not yet been determined and an appeal to this court had not been taken, it was too late to upset what had been accomplished. The facts are not too dissimilar to those in Sullivan v. Joint Ind. Consol. School Dist. No. 102, *supra,* where the county board attempted to upset a consolidation pending an appeal. We held that this could not be done. In so doing, we said (251 Minn. 385, 88 N. W. [2d] 6):

"* * * In order to prevent confusion, the order of consolidation is suspended during an appeal, but it would be absurd to hold that such suspension gave a county board of a county in which one of several districts is located authority to destroy the consolidation during the period of such suspension. We therefore hold that, pending an appeal from an order of consolidation, the operation of the order is suspended in order to permit the districts included in the consolidation to function until the consolidated district can take over the management of the school affairs within its territory or until it is determined that the consolidation is invalid, but the status quo of all parties is to be maintained during such appeal. It follows that the county board lacked authority to dissolve District No. 10 during the appeal, and its order attempting to do so is a nullity."

Under § 122.23, subd. 8, the various boards involved are given 45 days after approval of the plat by the commissioner of education to either adopt or reject it. If the plat is rejected, that is the end of the proceeding. Failure of boards to act likewise terminates the proceeding, but, if they approve it, their function has been completed, and, after all of these boards have acted favorably upon the consolidation, it is too late for any one of them to rescind what has been done.

The matter is not unlike that in which we have held that, once a petition in school district dissolutions, consolidations, or reorganizations is acted upon, it is too late for a petitioner to withdraw his name and thereby upset the proceeding.[8] The same ought to apply here to ac-

---

[8]In re Dissolution of School Dist. No. 33, 239 Minn. 439, 60 N. W. (2d) 60; Sullivan v. Joint Ind. Consol. School Dist. No. 102, 251 Minn. 378, 88 N. W. (2d) 1.

tions of the boards involved in the consolidation. Once the consolidation has been completed, their action is final and may not thereafter be countermanded. We therefore hold that the attempted rescission in this case was ineffective, and it follows that the court's orders denying motions to reopen and to permit the newly elected board of the Unorganized Territory to intervene in order to interpose the attempted rescission was not an abuse of discretion.

Appellants rely in part on Caton v. Board of Education, 213 Minn. 165, 6 N. W. (2d) 266. The facts of that case are entirely dissimilar to those in the case now before us. The Caton case simply involved the right of a school board to rescind a resolution which had adopted a certain system of shorthand for the schools. In holding that such resolution could be rescinded by further action of the board, we said (213 Minn. 167, 6 N. W. [2d] 268):

"* * * We can see no more in the resolution than a statement of policy on the part of the board. This being so, then, obviously, it could be reconsidered or rescinded, if deemed advisable by the board, unless, while in force, contractual rights had been created. Here there were none."

Obviously, there was nothing final about the action of the board in determining a matter of school policy. That is entirely different from completing its statutory duties under the consolidations here.

■ Appellants also contend that the consolidations should be invalidated because "three, if not four, of the five members of the Board who made the decisions" favoring the consolidations now under review were biased. Apparently the claim is that they had prejudged the matter prior to acting upon it. As a matter of fact, there is no more reason to assume that those who originally favored consolidation were biased than that the three of the five who subsequently voted for a rejection approached their duties in the same manner. We must assume that all of these public officials, whether for or against consolidation, acted with the object of finding the best possible solution for a troublesome problem. We see no use in further discussing this contention, but it might be said that in the light of the long and bitter litigation that has ensued over attempts to solve the school problems in this area

it is only natural that strong feelings should have developed on the part of officials and private individuals alike. It is not even strange that some have changed their minds as to the best solution from time to time. While there is probably no perfect solution for these problems, and even less likelihood that one can be found that would meet with the approval of all the people in the area affected, we cannot attribute to those favoring one plan over the other such bias that they would fail to act in accordance with their best judgment. That is all that can be asked of any official.

■ We come then to the final and crucial question: Was the action of the board so arbitrary, fraudulent, capricious, or oppressive or in such unreasonable disregard of the best interest of the territory affected[9] that it should be nullified by this court?

The scope of review of an appeal of this kind has been so often stated that it hardly bears repeating. In In re Dissolution of Ind. School Dist. No. 27, 240 Minn. 257, 260, 60 N. W. (2d) 617, 619, we said:

"The scope of our review on an appeal of this kind is governed by our statute and our decisions construing it. That the action of a county board in dissolving a school district, as well as in attaching it to another district, is legislative in character is now so well established that it needs no citation of authority. A review of such action by the court is limited by statute to a much narrower scope than review in an ordinary civil action. This court, as well as the trial court, must limit its inquiry to a consideration of whether the action of the county board was arbitrary, oppressive, unreasonable, or fraudulent or based upon an erroneous theory of law. * * * We will not reverse merely because we disagree with the honest exercise of judgment by the county board.

"The wisdom of the statute involved is not a matter for judicial determination."[10]

---

[9]Minn. St. 127.25, subd. 1(3).

[10]We quote from this case because it seems to have been selected as representative of the rule applicable to these appeals by the Education Laws Commission of 1957, whose recommendations were largely adopted in the amendment of the school code by Ex. Sess. L. 1959, c. 71, from

In construing the term "best interest of the territory affected," we must have in mind the best interest of the whole territory involved in the consolidations. While appellants would have us view these proceedings piecemeal on the assumption that part of the Unorganized Territory would be left destitute by the Cass Lake-Bena and Walker-Hackensack proceedings, it is apparent that we must now view all three proceedings together, in the light of the fact that all of the Unorganized Territory involved here will be attached to one of three school districts now maintaining secondary schools. While the proceeding that will attach the remaining portion of the Unorganized Territory to Remer was started later than the other two proceedings, they should all be upheld or none. When we look at the matter in that way, we can hardly hold that the action of the board was so arbitrary, fraudulent, capricious, or oppressive or in such unreasonable disregard of the best interest of the territory affected that we would be justified in setting it aside. After all, the initial decision in these matters has been delegated by the legislature to a county board or a school district board or the board of an unorganized territory, or a combination of them, depending upon what kind of a proceeding we are dealing with.

In this case, the only secondary schools that have been operated by the Unorganized Territory in recent years have now been discontinued. All of the children of high school age have for some years been educated in one of the three schools to which they will now belong after these consolidations become effective. While it may appear to some that there is a better solution, it is doubtful whether it could be worked out in such a way as to benefit all of the territory affected. Without considering the best interests of the Cass Lake, Walker, and Remer school districts, it is conceivable that some would honestly believe that it would be better for the Unorganized Territory to build its own school or schools. It is doubtful that the location of such school or schools, wherever they might be within the Unorganized Territory, would satisfy more than a small segment of the population, but, be

which we take the appeal provisions found in § 127.25. The comments of the commission may be found in Tentative Draft of Laws Relating to Elementary and Secondary School Education (July 1958), p. 124.

that as it may, looking at the matter realistically, it would seem that it would be better to have three relatively good schools in this sparsely settled area than to have four or more schools of inferior quality. The children who are entitled to the best education they can get cannot be disregarded in determining what is for the best interests of the territory affected.

Without reciting in detail the evidence in a voluminous record upon which we base our decision,[11] it is clear that the evidence would not

[11]Probably the best summary of the relative financial standing and school load of the districts is to be found in defendants' exhibit 51 prepared by the Director of Field Studies of the University of Minnesota. He explained it as follows:

"We made a comparison of the districts as existed, which would be Walker, Cass Lake, Remer and the unorganized territory. In Walker the information is it had a valuation of $618,865.00, which is 26.5 percent of the valuation of the entire area, the entire area meaning the combination of all four of the districts that are listed. It had a pupil population of 358 elementary pupils, 280 secondary pupils or a total of 638 pupils, which is 26.7 percent of the pupils of the entire area. The assessed valuation per pupil in the Walker district was $970.00. The same information for Cass Lake shows an assessed valuation of $413,521.00, which is 17.7 percent of the valuation of the entire area; enrollment 422 elementary students, 327 secondary students, a total of 749 which gives Cass Lake 31.2 percent of the pupils of the entire area. The assessed valuation per pupil in Cass Lake, $551.00. For Remer, the area in sections 308, assessed valuation $256,592.00, 11 percent of the valuation of the entire area, and enrollments were 174 elementary and 149 secondary pupils or a total of 323. 13.5 percent of the pupils of the entire area, and its valuation was $794.00 per pupil. For the Unorganized Territory, it had 802 sections, a valuation of $1,046,729.00 which meant it had 44.8 percent of the valuation of the entire area. Its pupil population was 505 elementary and 180 secondary pupils, a total of 685. It then had 28.6 percent of the pupils of the entire area, and the assessed valuation per pupil of $1,528.00. In the second set of computations gives the corresponding kind of information for the proposed district when Hackensack and Walker are put together and Bena and Cass Lake are put together and when Longville, Boy River and Federal Dam are put with Remer. For the Walker-Hackensack combination, there are 249 sections and an assessed valuation of $923,650.00, which would give it 39.8 percent of the valuation of the entire area; the pupil

justify invalidating this proceeding on the grounds specified in our statute as justifying invalidation of a proceeding of this kind. It is to be hoped that the bitterness engendered over these many years of litigation will now be forgotten so that the cooperation of all the people in the area can be obtained in providing for the children of school age the best education possible within this troublesome area.

Affirmed.

---

population of 460 elementary and 328 secondary, which is a total of 788 pupils, which would be 32.7 percent of the entire area. Assessed valuation per pupil for that combination would be $1,172.00. The Cass Lake-Bena combination would have 301 sections and it would have an assessed valuation of $697,115.00; it would be 30 percent of the valuation, and pupil population of 511 elementary and 361 secondary pupils, a total enrollment of 872. This enrollment is 36.1 percent of the pupils of the entire area, and its assessed valuation would be $799.00. The Remer-Longville-Federal Dam-Boy River combination would be an area of 784 sections, $699,592.00 of valuation, which would constitute 30.2 percent of the entire valuation of the area; pupil population of 485 elementary, 267 secondary pupils, or a total of 752 pupils, which would give it 31.2 percent of the pupils of the entire area. The assessed valuation per pupil is $930.00."