213 N.W.2d 631 (1973)
In re Appeal from an Order of Annexation of INDEPENDENT SCHOOL DISTRICT NO. 381 IN LAKE COUNTY with the Unorganized Territory in the County of St. Louis, etc.
MelRoy PETERSON, Appellant,
v.
BOARD OF COUNTY COMMISSIONERS, ST. LOUIS COUNTY, Minnesota, Respondent,
Warren Spannaus, Attorney General, State of Minnesota, Intervenor.
No. 43796.
Supreme Court of Minnesota.
December 14, 1973.
*632 Courtney Gruesen & Petersen and Thomas W. Gruesen, Duluth, for appellant.
Keith M. Brownell, Co. Atty., Bruce L. Anderson, Duluth, Asst. Co. Atty., for respondent.
Warren Spannaus, Atty. Gen., Curtis D. Forslund, Sol. Gen., Charles T. Mottl, Special Asst. Atty. Gen., St. Paul, for intervenor.
Heard before KNUTSON, C. J., and OTIS, PETERSON, MacLAUGHLIN, and YETKA, JJ., and considered en banc.
KNUTSON, Chief Justice.
This is an appeal from an order of the district court of St. Louis County in a proceeding *633 involving a school annexation under the provisions of Minn.St. 122.44.
In 1967, the legislature, in a declared effort to improve the quality of education in this state, provided for the attachment of all areas in the state, except Fort Snelling, to independent or special school districts maintaining classified elementary and secondary schools, grades one through twelve. The policy declaration of the legislature is found in Minn.St. 122.41, and reads as follows:
"It is hereby declared to be the policy of the state to encourage the reorganization of school districts into such local units of administration as will afford better educational opportunities for all pupils, make possible a more economical and efficient operation of the schools and insure a more equitable distribution of public school revenue. To this end all area of the state except Fort Snelling shall after July 1, 1971, be included in an independent or special school district maintaining classified elementary and secondary schools, grades one through twelve."
In order to expedite its declared purpose the legislature established a timetable. Minn.St. 122.42 provides that between the dates of May 25, 1967, and July 1, 1970, districts not maintaining classified schools could become part of districts with classified schools through the statutory methods of annexation and consolidation under Minn.St.1965, §§ 122.21, 122.22, or 122.23. Minn.St. 122.43 provides that if such districts and unorganized territories[1] had not become attached to a district maintaining a classified school system by July 1, 1970, they were to be dissolved.
Minn.St. 122.44, which is involved in this litigation, establishes a procedure whereby school districts dissolved by action of law on July 1, 1970, and unorganized territories were to become attached to organized districts maintaining classified schools prior to July 1, 1971. See, § 122.44, subd. 1. This procedure may be summarized in the following manner:
(1) The auditor of the county in which the dissolved district or major portion of the dissolved district or unorganized territory was situated was to submit the identification number and other relevant information about the district or territory to the county board of commissioners. § 122.44, subd. 2.
(2) The county board would then issue an intermediate order for the proposed attachment of the district or territory to a district maintaining classified schools. § 122.44, subd. 2.
(3) In proposing the attachment, the county board was to consult with the County School Survey Committee[2] and consider the standards formulated by the State Advisory Commission on School Reorganization. § 122.44, subd. 2.
(4) The county auditor was then required to have a plat made showing in detail the areas to be joined and to send the plat, together with the intermediate order of the county board, to the State Board of Education. § 122.44, subd. 3.
(5) A true copy of the plat and a statement of information was then to be filed with the auditor of the county in which a portion of the dissolved district was located and with the clerk of the district to which the attachment was proposed. § 122.44, subd. 3.
(6) The state board or its representative was required to conduct a hearing on the attachment if requested by the board of any district, a county board of commissioners, "or the petition of 50 percent of the *634 resident voters or 20 resident voters, whichever is less, living within the area proposed for attachment." § 122.44, subd. 4.
(7) Within 60 days of the receipt of the plat, the state board was to return it to the county auditor who submitted it, endorsing thereon approval, modification, or rejection. § 122.44, subd. 4.
(8) Upon 10 days' notice to the affected districts the attachment would be made by the final order of the county board, effective July 1 unless otherwise specified. § 122.44, subd. 5.
(9) If the above procedure had not been completed by July 1, 1971, the area involved became subject to the attachment orders of the commissioner of education with the approval of the State Board of Education. § 122.44, subd. 5.
This case involves the unorganized territory in St. Louis County which is described as the south half of township 57, range 12, the south half of township 57, range 13, in the Town of Duluth, Town of Alden, Town of Ault, Town of Fairbanks. Under § 122.43 it was mandatorily dissolved by operation of law on July 1, 1970. In accordance with § 122.44, subd. 2, the St. Louis County auditor presented to the county board of commissioners the number and territory of the district as well as information concerning the number of children attending school in the affected area.
On July 20, 1970, the county board, pursuant to § 122.44, subd. 2, issued its intermediate order proposing attachment of the territory set out above to Independent District No. 381, which is also Lake County. At this time, the St. Louis County board had at its disposal the St. Louis County School Survey Committee Final Consolidation Recommendation and the State Advisory Commission on School Reorganization Twelfth Report. The school survey committee, which was made up entirely of St. Louis County residents, recommended that the unorganized territory in question be annexed to the Lake County school district.
Subsequent to the intermediate order, the St. Louis County auditor had a plat of the unorganized territory made and, pursuant to § 122.44, subd. 3, sent it, along with a copy of the intermediate order, to the State Board of Education. Copies of the plat and intermediate order were also sent to the clerk of the Lake County school district and a copy of this information was filed with the auditor of St. Louis County.
Subsequent to its receiving the plat and copy of the intermediate order, the State Board of Education received a request for a hearing in the form of a petition. On September 10, 1970, a hearing was held at the county seat of Lake County which Richard Bye, a member of the state board, attended. Appellant has admitted that this hearing conformed with § 122.44, subd. 4.
By letter dated September 14 and received by the St. Louis County auditor on September 16, 1970, the State Board of Education sent its endorsement of the plat and plan along with its reasons for doing so.
Subsequently, on October 13, 1970, the St. Louis County board issued its final order attaching the territory involved to Lake County school district, and all parties were informed, pursuant to § 122.44, subd. 5. On November 10, 1970, MelRoy Peterson appealed to the district court, St. Louis County, from the final order of the county board.
The trial court found that the transcript of the September 10, 1970, hearing was not completed until February 8, 1971, long after the state board had issued its approval. The court therefore ordered that the State Board of Education be furnished with a transcript and advise the court, after studying it, whether it still approved the annexation. On April 10, 1972, the state board notified the court that it affirmed its earlier decision, whereupon the district court dismissed appellant's appeal on April 17, 1972.
*635 When appellant initially appealed to the district court, he did so on the following grounds as found in § 127.25, subd. 1:
(1) That the county board had no jurisdiction to act in said matter;
(2) That the county board exceeded its jurisdiction;
(3) That the action appealed from is arbitrary, capricious, oppressive, and in unreasonable disregard of the best interest of the territory affected;
(4) That the order of October 13, 1970, appealed from is based on an erroneous theory of law.
Trial was scheduled for the September 1971 term, but because of a series of continuances did not take place until February 4, 1972. Just prior to the trial, on January 17, 1972, appellant notified the county attorney and the attorney general, pursuant to Rule 24.04, Rules of Civil Procedure, that he also planned to attack the constitutionality of § 122.44. On January 24, 1972, the attorney general wrote appellant, asking the specific grounds upon which he would base his attack and stating that a determination whether to intervene could not be made without this information. This course of conduct on the part of appellant in challenging the constitutionality of the statute was objected to by respondent at the district court trial. Respondent, furthermore, requested that appellant be precluded from making his constitutional arguments because of his failure to give adequate notice to the attorney general. The record indicates that appellant and respondent were heard on the constitutional question and the Rule 24.04 notice question in chambers. The findings of the district court are silent as to the Rule 24.04 notice issue, but do contain an affirmative finding of the constitutionality of § 122.44. From these facts, and in the absence of any record of the arguments made below, it can be inferred that the court found that appellant's notice to the attorney general satisfied Rule 24.04.
At the conclusion of the trial, the district judge stated that all briefs would be required to be submitted by February 21, 1972, including the attorney general's brief with regard to the constitutionality of the statute. Appellant, by letter dated February 8, 1972, informed the attorney general of this fact. On February 15, 1972, 6 days before the deadline for submission of briefs, the attorney general received appellant's trial brief and was given some indication as to the grounds upon which appellant attacked § 122.44.
The following questions are presented by the appeal here:
(1) Were all procedures followed by the St. Louis County board and the State Board of Education proper?
(2) Did appellant's delay in notifying the attorney general of his intention to question the constitutionality of the act involved pursuant to Rule 24.04, Rules of Civil Procedure, deprive this court of jurisdiction to determine the constitutionality of the act involved?
(3) If the constitutional issue may be considered by the court, is Minn.St. 122.44 an unlawful delegation of state legislative power in violation of Minn.Const. art. 3, § 1?
(4) Does Minn.St. 122.44 violate the equal protection clauses of the United States and Minnesota Constitutions?
The scope of our review on an appeal of this kind is stated in Farrell v. County of Sibley, 135 Minn. 439, 161 N.W. 152 (1917), which is quoted in In re Certain School Districts, Freeborn County, 246 Minn. 96, 104, 74 N.W.2d 410, 416 (1956). The Farrell case involved G.S.1913, § 2676, which is a predecessor of Minn.St. 1971, § 127.25, which is the governing statute at this time. We said (135 Minn. 441, 161 N.W. 152):
"* * * In proceedings under the statute for a change in the boundaries of school districts, the question whether the *636 best interests of the affected territory, and of those residing therein, will be enhanced by the proposed change, is the primary question submitted to the board of county commissioners, but is not the question with which the court is confronted upon an appeal from the order of that body. To avoid intermeddling with the legislative judgment and discretion vested in the local body, the question presented to the court is much narrower and, aside from questions of law going to the regularity of the proceedings and the jurisdiction of the local board or tribunal, is limited to an inquiry into the character rather than the propriety or necessity of the order."
In the Freeborn County case, we also said (246 Minn. 107, 74 N.W.2d 417):
"On appeal to this court, our review, like that of the district court, is limited to a consideration of whether the trial court has confined its review to the limited scope of such review and, aside from jurisdictional questions, whether the evidence reasonably supports the determination of the trial court, having in mind at all times the limited scope of such review."
In examining the record in this case, we are convinced that the evidence reasonably supports the finding of the trial court that the actions of the county board and the State Board of Education were in full compliance with the applicable statutory provisions.
We come, then, to the question whether we can properly consider the constitutionality of the statute involved. We have frequently held that failure to give the required notice to the attorney general under Rule 24.04 where the constitutionality of a legislative act is involved deprives the court of its jurisdiction. In re Condemnation by Oak Center Creamery Co. v. Grobe, 264 Minn. 435, 119 N.W.2d 729 (1963); Lowe v. Patterson, 265 Minn. 42, 120 N.W.2d 313 (1963); In re Appeal of Leary, 272 Minn. 34, 136 N.W.2d 552 (1965); Campbell v. Glenwood Hills Hospitals, Inc., 273 Minn. 525, 142 N.W.2d 255 (1966); Village of Farmington v. Minnesota Municipal Comm., 284 Minn. 125, 170 N.W.2d 197 (1969); Schoepke v. Alexander Smith & Sons Carpet Co., 290 Minn. 518, 187 N.W.2d 133 (1971).
The required notice was served here a short time before the case was called for trial. The question is, does failure to serve such notice in time to give the attorney general an opportunity to determine whether he should intervene or not likewise deprive the court of jurisdiction? While we do not condone the delay in giving notice in this case, we are convinced that this is not the proper time to lay down guidelines as to when such notice must be served. In view of the trial court's finding that the act involved was constitutional, the attorney general has obtained the decision he would have sought had he been given more time. We must caution those who are attacking the constitutionality of a legislative act that in another case, where the result would be otherwise, failure to serve the notice in time to allow the attorney general time within which to determine whether to intervene or not may be fatal. In this case nothing could be accomplished by so holding.
In view of the fact that the trial court has held the act constitutional, we briefly pass on the two issues raised, namely: Is Minn.St. 122.44 an unlawful delegation of state legislative power in violation of Minn.Const. art. 3, § 1; and does § 122.44 violate the equal protection clauses of the United States and Minnesota Constitutions by denying Independent School District No. 381 or its representatives the right to be heard either by referendum or by election on the issue of whether the unorganized territory located within St. Louis County should be attached to the school district which lies entirely within Lake County?
As to the first question, the issue might be divided into two subissues, namely:
*637 Whether establishing and changing school district boundaries is a legislative function; and whether the delegation of such function in this case is proper.
The exclusive power of the legislature to create school district boundaries and change them at will has long been recognized in this state. In Farrell v. Sibley County, 135 Minn. 439, 440, 161 N.W. 152 (1917), in dealing with an appeal from the enlargement of a school district, this court stated:
"* * * The matter of establishing, enlarging the boundaries of or of dissolving municipal corporations is purely legislative. Jurisdiction in that respect cannot, either directly or indirectly, be conferred upon the courts. State v. Simons, 32 Minn. 540, 21 N.W. 750; 2 Notes on Minn. Reports, 659."
This language was quoted with approval by the court in In re Consolidation of School Districts, Freeborn County, 246 Minn. 96, 105, 74 N.W.2d 410, 416 (1956), as a restatement of part of the "fundamental law" in this area.
As to the propriety of the delegation made in this case, Town of Bridgie v. County of Koochiching, 227 Minn. 320, 35 N.W.2d 537 (1948), is controlling. In that case, the appellant challenged the validity under Minn.Const. art. 3, § 1, of a statute enabling the board of county commissioners to dissolve townships with an assessed valuation of less than $40,000. In rejecting appellant's argument, the court stated (227 Minn. 326, 35 N.W.2d 541):
"It is well settled that a legislature may delegate part of its power over local subjects to county boards and other public bodies within the legislative classification. 11 Am.Jur., Constitutional Law, § 223, citing Wright v. May, 127 Minn. 150, 149 N.W. 9, L.R.A.1915B, 151, and Searle v. Yensen, 118 Neb. 835, 226 N. W. 464, 69 A.L.R. 257."
The court went on to confirm this point of view by observing that there is nothing in Minn.Const. art. 11, the provision which gave the legislature the power to organize new counties, which denies to the legislature power to delegate to counties the capacity to act upon matters such as those here involved. Much of appellant's case hinges on the court's statement, "It is obvious that the statute in question relates to matters of purely local concern." 227 Minn. 327, 35 N.W.2d 541. Appellant applies this statement to the present case and attempts to create a rule that county board decisions can have no effect beyond the boundaries of the county. However, a more detailed look at the source of the court's words will discredit this point of view.
In the same opinion, the court also quotes from 14 Am.Jur., Counties, § 30 (227 Minn. 326, 35 N.W.2d 541):
"* * * [T]here is a well-settled rule that inhibitions against the delegation of legislative power do not apply to statutes vesting local bodies such as county boards with authority to legislate upon matters purely of local concern." (Italics supplied.)
This language can now be found at 56 Am.Jur.2d, Municipal Corporations, Etc., § 190. Interestingly, this sentence is footnoted to 16 Am.Jur.2d, Constitutional Law, § 250, which states:
"It is a well-settled rule, supported with practical unanimity by the authorities, that the general doctrine prohibiting the delegation of legislative authority has no application to the vesting in political subdivisions of power to govern matters which are local in scope." (Italics supplied.)
This statement is not footnoted to any authority. The point of this review of American Jurisprudence is to show that in all likelihood the court in the Bridgie case borrowed the phrase "of purely local concern" from American Jurispurdence, whose writers used the phrase to connote the opposite of "statewide" and not in the strict sense which appellant asserts.
*638 Appellant also relies on Village of Brooklyn Center v. Rippen, 255 Minn. 334, 96 N.W.2d 585 (1959). That case involved the right of the village of Brooklyn Center to enact an ordinance requiring boaters using a lake within its boundaries to have a license. We held that while regulating activity on the lake was a matter of local concern and therefore the village had implied power to enact ordinances containing such regulations, licensing of boats, which move about the state, is not a matter of local concern. In other words, we held in that case that if the village of Brooklyn Center could license boats so could every other municipality where the boat happened to be, which would impose an impossible burden on those using our lakes. The case is of no help here.
We are convinced that the delegation of legislative power here does not violate Minn.Const. art. 3, § 1.
As to the second question posed above, appellant claims mainly that the people of Lake County should have been given a voice in the annexation through election or referendum. We have already negated that contention in In re Appeal of Lego v. Rolfe, 268 Minn. 483, 129 N.W.2d 811 (1964). In Muehring v. School Dist. No. 31 of Stearns County, 224 Minn. 432, 28 N.W.2d 655 (1947), we held that where a statute does not authorize a referendum and one is held by the authority in charge, it is unlawful redelegation by that authority of the power granted by the legislature.
The landmark constitutional case in this area of state legislative power and alteration of municipal boundaries is Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). A Pennsylvania statute allowed the consolidation of a contiguous smaller city with a larger city if the combined majority vote of both cities approved of it. In Hunter, a combined majority approved, but a clear majority of the smaller city actually disapproved. The appellants in that case claimed that the residents of the smaller city were denied due process of law by the consolidation procedure. The Supreme Court refused to consider this issue, setting down a lengthy statement on the supremacy of states over the boundaries of municipal corporations. In recent years the Hunter case has been cited by many courts as standing for the proposition that the way in which a state divides or changes the division of the territory in its domain is nonjusticiable because it involves a political question beyond constitutional attack. Detroit Edison Co. v. East China Township School Dist. No. 3, 247 F.Supp. 296 (D.C.1965), affirmed 378 F.2d 225 (6 Cir. 1967), certiorari denied 389 U. S. 932, 88 S.Ct. 296, 19 L.Ed.2d 284 (1967); Hammonds v. City of Corpus Christi, 343 F.2d 162 (5 Cir. 1965), certiorari denied 382 U.S. 837, 86 S.Ct. 85, 15 L.Ed.2d 80; International Harvester Co. v. Kansas City, 308 F.2d 35 (10 Cir. 1962), certiorari denied 371 U.S. 948, 83 S.Ct. 503, 9 L.Ed.2d 498 (1963).
Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), represents the first qualification of the Hunter decision by the U. S. Supreme Court. In holding that a redistricting which excluded blacks from voting in the city of Tuskegee was unconstitutional, the court said (364 U.S. 344, 81 S.Ct. 125, 5 L.Ed.2d 115):
"* * * Thus, a correct reading of the seemingly unconfined dicta of Hunter and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases."
The courts have responded to this modification of Hunter in two basic ways. In Detroit Edison v. East China Township School Dist. No. 3, supra, plaintiffs attacked a Michigan statute which required for school district annexation the approval of (1) the state superintendent of schools, (2) a majority vote of the board of directors *639 of the annexing district, and (3) a majority vote of qualified electors of the annexed district. Plaintiffs, voters of the annexing district, contended that by only allowing them a voice through their representatives and not a direct vote the statute denied them equal protection. The court refused to consider the issue on the ground that it was not justiciable. It admitted that Gomillion modified Hunter, but felt it could not extend this qualification in the redistricting area to the annexation area without explicit direction from the Supreme Court.
The court in Adams v. City of Colorado Springs, 308 F.Supp. 1397 (D.Colo.1970), affirmed, 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970), interpreted the Gomillion case in a different manner. In Adams, a Colorado annexation statute provided for two modes of annexation depending on the degree of contiguity of the area to be annexed to the annexing municipality. One method provided for an election in the area to be annexed and the other a resolution of the city council of the annexing community. The court rejected the argument that a constitutional challenge to this statute would be nonjusticiable. Citing Detroit Edison and its interpretation of Gomillion, the court stated (308 F.Supp. 1401):
"* * * We doubt whether the Supreme Court would so categorize annexation problems. There is no reason for exempting annexation procedures from the requirements of equal protection whch apply to all other areas of state legislative activity."
We think this is the better view and therefore hold that the subject matter in this case is justiciable.
Finding a justiciable controversy, the Adams court proceeded to the merits. The plaintiffs, landowners in the area to be annexed, cited the one man-one vote cases and the voting-rights cases just as appellant does in the case at hand. To this assertion the court responded (308 F.Supp. 1403):
"On its face this argument appears to have merit in that the right to vote poses a sensitive constitutional issue demanding scrupulous evaluation. However, on a closer look, it does not appear that the plaintiffs' rights are of the kind that have been upheld by the Supreme Court. The factor present in the cited cases which appears to have been crucial is that the franchise was granted to one group of persons to the detriment of another group. In most instances one group had votes with disproportionate weight as opposed to a group which was partially or wholly disenfranchised, or there has been a purposeful juggling of boundaries for the purpose of excluding a particular group. * * * In the case at bar none of the described conditions are present and so it cannot be said that there exists the invidious discrimination which has been heretofore condemned by the Supreme Court."
This language is very similar to the view which Mr. Justice Harlan expressed in his concurring opinion in Hunter v. Erickson, 393 U.S. 385, 393, 89 S.Ct. 557, 562, 21 L. Ed.2d 616, 623 (1969):
"At the outset, I think it well to sketch my constitutional approach to state statutes which structure the internal governmental process and which are challenged under the Equal Protection Clause of the Fourteenth Amendment. For equal protection purposes, I believe that laws which define the powers of political institutions fall into two classes. First, a statute may have the clear purpose of making it more difficult for racial and religious minorities to further their political aims. Like any other statute which is discriminatory on its face, such a law cannot be permitted to stand unless it can be supported by state interests of the most weighty and substantial kind. McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

*640 "Most laws which define the structure of political institutions, however, fall into a second class. They are designed with the aim of providing a just framework within which the diverse political groups in our society may fairly compete and are not enacted with the purpose of assisting one particular group in its struggle with its political opponents."
There is still another battleground upon which the applicability of the voting cases may be fought, namely, the legislative-administrative distinction. In Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), plaintiffs challenged a law providing for the election of a county school board by elected members of local boards rather than the populace itself. At 387 U.S. 108, 87 S.Ct. 1552, 18 L.Ed.2d 653, the court, upholding the statute, stated:
"We find no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election."
In its opinion the court pointed out that the county board of education performed administrative as opposed to legislative functions. For this reason the voting cases were deemed inapplicable.
A liberal application of Sailors to the decisions of this court would make the voting cases applicable to the county board of commissioners, for in Hanlon v. Towey, 274 Minn. 187, 197, 142 N.W.2d 741, 747 (1966), this court held that the county board is a legislative body and apportionment of its election districts is subject to the voting cases, saying:
"We limit our decision to a determination that the equality-of-voting-rights principle, declared embodied in the equal protection clause of the Federal Constitution and its equivalent contained in our state constitution, applies to county government as now constituted. * * *
* * * * * *
"We are also mindful of the argument that could have been made (contrary to the assumption of the parties to this appeal) that any powers delegated to county boards which might be classified as legislative in character are so minimal that the county must be viewed as an administrative unit of local government, distinctly dissimilar to a municipal corporation vested with a substantial quantum of the legislative power of the state. We cannot ignore the force of this argument since the impact of the reapportionment decisions necessarily depends upon the type and purpose of the governmental unit involved. However, it must be recognized that the county board's power with respect to taxation, the county budget, capital improvements, welfare, health, the administration of justice, zoning, and many other areas of public service is quite different in variety and scope than that possessed by an administrative or special-purpose unit of government. Without spelling out the functions which we believe reflect the delegation of substantial legislative power, it is sufficient to say that an examination of the statutes dealing with the power delegated persuades us that the legislature itself does not regard the county as solely an administrative arm of state government. In fact, the tendency in this state, as elsewhere, is to enlarge the importance and magnitude of county functions."
But there is still another argument that can be made. Although the county boards in this state may be considered legislative, are they legislative for purposes of Sailors? In Keane v. Golka, 304 F.Supp. 331 (D.Neb.1969), due to statutory classification of the school districts the composition of the school district reorganization committee was heavily unbalanced in its representation. The court refused to label the committee legislative and to apply the voting cases. Instead, it pointed out that although reorganizing school districts has *641 been traditionally considered a legislative function, Mr. Justice Douglas, in a footnote to the majority opinion in Sailors, lists this as an administrative activity. Thus we have a traditionally legislative activity that is administrative for purposes of Sailors. Hence the voting cases do not apply.
While it so happens that the boundary of Independent School District No. 381 is the same as the boundary of Lake County, that is not true of the boundaries of many of our independent school districts. Many of them extend into two or more counties. The county does not operate the schools. The role of the county in the annexation proceedings involved here is simply to get the proceeding under way. Thereafter, the annexation is largely controlled by the State Board of Education, which is representative of the entire state. No annexation can be completed without the approval of the state board.
In Waters v. Putnam, 289 Minn. 165, 183 N.W.2d 545 (1971), the Minnesota Water Resources Board approved a watershed district and, pursuant to statute, appointed its first board. We held that since the board of managers of the watershed district never stands for election, the citizens of one of the counties included in the district were not denied equal protection of the law.
The same is true here. The State Board of Education, which is representative of all the people of the state, does not stand for election. It must follow that appellant and residents of Lake County were not denied equal protection of the law merely because a proceeding of this kind was commenced by the county board of the county in which the major portion of a district dissolved under §§ 122.41 to 122.52 or an unorganized territory happened to be situated. See, § 122.44, subd. 2.
The decision of the trial court is affirmed.
NOTES
[1] Minn.St. 120.02, subd. 17, defines "unorganized territory" as "the portion of a county not included in organized districts, * * *. Unorganized territory is a public corporation."
[2] County School Survey Committees and the State Advisory Commission were organized pursuant to Minn.St.1969, 122.24. This provision was repealed by L.1971, c. 98, § 1, effective April 3, 1971.