## PAULINE C. PETERSON, A MINOR, BY RICHARD A. PETERSON, HER FATHER AND NATURAL GUARDIAN, AND ANOTHER v. DUANE HAULE, d.b.a. CHISHOLM DAIRY QUEEN, AND ANOTHER.

230 N. W. 2d 51.

May 16, 1975—No. 44989.

*Mathias & Brown* and *Robert E. Mathias,* for appellants.

*Abate, Wivoda & Ketola* and *Roland T. Wivoda,* for respondents.

Heard before Rogosheske, Todd, and MacLaughlin, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

Defendants appeal from an order denying their blended motion for judgment notwithstanding the verdict or for a new trial following a jury verdict for plaintiffs. Pauline C. Peterson, a minor, suffered serious injuries when she walked into an unmarked plate glass door at the Chisholm Dairy Queen store, which was owned and operated by defendant Duane Haule and had been constructed according to a design furnished by defendant International Dairy Queen, Inc. After consideration of the issues raised by defendants, we affirm.

Pauline, in the company of her parents, stopped at the Chisholm Dairy Queen on the evening of May 20, 1970. The Petersons resided in Hibbing, Minnesota, and had a lake cottage on Lake Leander about 26 miles from Hibbing. In traveling to and from their home to their lake cottage, the Petersons traveled through Chisholm, Minnesota. On the evening in question, they had stopped in Chisholm to pick up bottle gas and then decided

to stop at the Dairy Queen for a cone. They had been there on numerous occasions during the preceding 2 years to purchase refreshments. On this evening, they arrived at the store around 8 p. m. It had been raining that evening, but the evidence indicates it was not raining when they arrived. Dusk was setting in and the lights of the Dairy Queen were on, both inside and outside. Pauline was given money to purchase cones and left the family vehicle to enter the store. The car was parked some 10 to 20 feet from the doorway.

Pauline testified that she proceeded at a fast walk toward the store and was looking straight ahead as she approached the doorway. She was wearing glasses but stated that this did not interfere with her vision. She testified that, as she neared the store, it looked as if the door were not there and she saw only the inside of the Dairy Queen store. She said she bumped flush into the glass door and bounced back, the glass pane falling out toward her. A piece of broken glass caused a severe laceration of her right leg just above the ankle, a cut on her left knee, and other minor injuries. Pauline further testified that she had been in the store a number of times previously and that sometimes the door was open and sometimes it was shut. On those occasions, she had had no difficulty in entering or leaving the store.

The door in question was 7 feet in height, 3 feet wide, and encased by an aluminum frame. There was a 1½-inch aluminum crossbar on the inside of the door located at a height of 3½ feet. The outside door handle was on the aluminum frame. The glass panel was 1/4-inch thick and was kept very clean. There were no markings or decals of any kind on the door. Much of the equipment inside of the store was aluminum or gray in color.

At the time of the accident, Pauline was 10 years of age, about 5 feet in height, and weighed about 100 pounds. She was an above-average student. Her academic performance was not affected by the accident, although her other activities were limited as a result of the accident.

Richard Peterson, Pauline's father, testified that on the

evening of the accident, he parked his car in the blacktop lot of the Dairy Queen about 10 to 15 feet from the door of the store. He observed Pauline walking toward the store and saw her hit the door flush, as if it were not there, bounce back, and get cut by the falling glass. He ran to her assistance and immediately applied a tourniquet to her right leg. He, his wife, and defendant Haule rushed Pauline to the hospital.

Defendant Haule, the store owner, testified he was in his apartment in the store when he heard the crash of glass. He went to the scene and accompanied Pauline and her parents to the hospital. He testified that there were no markings or decals on the door and that it was kept very clean. He further said that the door in question was sometimes left open. He also admitted that the store's fluorescent lights tended to reflect off the surface of the parking lot when it was wet.

The matter was submitted to the jury on interrogatories, the original questions and answers being as follows:

"QUESTION 1: Did defendant [Haule] violate the statute which required markings on clear glass in the door?

"Answer: Yes (Yes or No)

"If your answer to Question No. 1 is 'yes', then answer Question No. 2.

"QUESTION 2: Was such violation a direct cause of the accident?

"Answer: No (Yes or No)

"QUESTION 3: Was defendant [Haule] negligent in failing to install tempered glass in place of plate glass in the door?

"Answer: No (Yes or No)

"If your answer to Question No. 3 is 'yes', then answer Question No. 4.

"QUESTION 4: Was such negligence a direct cause of the injury sustained by Pauline Peterson?

"Answer: —— (Yes or No)

"QUESTION 5: Was defendant International Dairy Queen negligent in failing to design and construct the Chisholm Dairy Queen with tempered glass instead of plate glass in the door?

164

"Answer: No (Yes or No)

"If your answer to Question No. 5 is 'Yes', then answer Question No. 6.

"QUESTION 6: Was such negligence a direct cause of the injuries sustained by Pauline Peterson?

"Answer: —— (Yes or No)

"QUESTION 7: Was defendant International Dairy Queen negligent in failing to modify, or in failing to direct defendant [Haule] to modify the Chisholm Dairy Queen by placing markings on the clear glass of the door involved in the accident?

"Answer: Yes (Yes or No)

"If your answer to Question No. 7 is 'yes', then answer Question No. 8.

"QUESTION 8: Was such negligence a direct cause of the accident?

"Answer: No (Yes or No)

"QUESTION 9: Was Pauline Peterson negligent in failing to see the closed glass door?

"Answer: Yes (Yes or No)

"QUESTION 10: Was such negligence a direct and contributing cause of the accident?

"Answer: Yes (Yes or No)

"If you find that two or more parties were negligent, and that the negligence of each was a direct or contributing cause of the accident, and that their negligence concurred in causing the accident, then, and only then, answer Question No. 11.

"QUESTION 11: Taking all of the negligence which contributed to the accident at 100 per cent, what percentage or proportion thereof do you attribute to:

"Duane [Haule]                                    25%
"International Dairy Queen                          65%
"Pauline Peterson                                  10%
        "Total                                    100%

"QUESTION 12: What damages did the plaintiff Pauline Peterson sustain as a direct cause of the accident?

"Answer: $40,000

"QUESTION 13: What damages did the plaintiff Richard Peterson sustain as a direct cause of the accident?

"Answer: $2,539.05"

Counsel had agreed that since the Honorable N. S. Chanak, the trial judge, had to be away that evening, the Honorable Patrick O'Brien could receive the verdict if rendered during the evening. Judge O'Brien did receive the verdict and, following consultation with counsel, advised the jury that it appeared to him that there were some inconsistent answers. He then instructed the jury to return the next morning to meet with Judge Chanak. He also advised them that if they had any questions, they should prepare them in writing, but cautioned the jury they could only deliberate in the jury room.

The next morning plaintiffs and defendants moved for judgment in their favor. The trial judge declined to pass on these motions and recalled the jury. The jury was polled and indicated that their answers were unanimous. The jury indicated they were confused by the use of the word "contributing" in Question 10. The jury then submitted written questions to Judge Chanak which had been prepared in the jury room that morning. The questions were as follows:

"We do not understand the definition between direct cause and contributing cause. Will the Court please re-read this for us?"

"Why was the word contributing mentioned in Question No. 11 and not in any previous questions?"

"Why do you not send the definitions of direct and contributing causes into the jury room? Would you please repeat these definitions?"

"Can both parties have contributing, as well as direct, causes?"

"The answer to Question 11, on percentages, is our conclusion of the causes in this case. Being that the inclusion of this question hinges on the answers to previous questions, which were misunderstood, can we now alter any answers on these previous questions?"

The court then determined to resubmit the case to the jury, restating Question 10 to read as follows:

"* * * If you find that two or more parties were negligent, and that the negligence of each was a direct cause of the accident, and that their negligence concurred in causing the accident, then, and only then, answer Question No. 11."

The trial court repeated its original instructions as to direct cause and the jury retired. The jury returned in about one hour, changing its answers to Questions 2 and 8 from "No" to "Yes." Based on these answers the court ordered judgment to be entered for plaintiffs. Defendants moved for judgment notwithstanding the verdict or for a new trial, and this appeal is taken from the denial of their blended motion.

Defendants raise the following issues:

(1) Whether plaintiff Pauline Peterson's negligence in failing to see the glass door must be, as a matter of law, greater than that of defendants.

(2) Whether the Minnesota Legislature intended that restaurants or places of refreshment, such as the Chisholm Dairy Queen, be included within the purview of Minn. St. 299G.11.

(3) Whether Minn. St. 299G.11 is unconstitutionally vague because it fails to define the standard of compliance required.

(4) Whether the trial court erred in refusing to enter judgment for defendants on the basis of the jury's first answers to the special interrogatories.

(5) Whether the defendants were granted a fair and impartial trial when the trial court resubmitted the case to the jury after informing the jury on two occasions that their initial verdict was inconsistent because of their answers to the direct cause questions.

This court has been greatly assisted in considering this matter by the thorough and comprehensive memorandum of Judge Chanak accompanying his order denying the blended motion of defendants.

■ With respect to the first issue, defendants place principal reliance on three cases: Dukek v. Farwell, Ozmun, Kirk & Co. 248 Minn. 374, 80 N. W. 2d 53 (1956); Munoz v. Applebaum's Food Market, Inc. 293 Minn. 433, 196 N. W. 2d 921 (1972); and Stapleman v. St. Joseph the Worker, 295 Minn. 406, 205 N. W. 2d 677 (1973). In Dukek, an 18-year-old Western Union messenger was injured when he walked into a glass door entrance to defendant's building. Plaintiff received a verdict in the trial court, but this court reversed, holding it was error not to enter judgment notwithstanding the verdict for defendant. The court stated (248 Minn. 379, 80 N. W. 2d 56):

"We fail to see how defendant can be held guilty of negligence under the facts of this case. It is inescapable that the accident happened because plaintiff did not look where he was going. In Johnson v. Brand Stores, Inc. 241 Minn. 388, 393, 63 N. W. (2d) 370, 373, we said:

" 'It is only when there is some distraction or other reason which will excuse the failure to see that which is in plain sight that it can be said that a person has exercised that degree of care required of an ordinarily prudent person.'

Here, there was nothing to distract plaintiff, nor was there anything to prevent his seeing the door and distinguishing the doors from the adjacent panels. An examination of the record and photographs before us can only lead to the conclusion that defendant was not guilty of negligence and that plaintiff was guilty of contributory negligence as a matter of law. Under these circumstances, it was error to deny defendant's motion for a directed verdict and to deny defendant's motion for judgment notwithstanding the verdict. Judgment should be entered for defendant."

The facts in the instant case take it outside the reasoning expressed above. First, the accident did *not* happen because Pauline did not look where she was going. On the contrary, she stated that she was looking straight ahead, but saw only an "open

space." Second, the peculiar lighting conditions and deceptive construction of the Dairy Queen facility are precisely the "other reason[s] which will excuse the failure to see that which is in plain sight." Third, as the trial court pointed out, Dukek involved an 18-year-old messenger, presumably a mature and responsible person, engaged in a business venture. On the other hand, the case at bar involves a 10-year-old girl on her way to get an ice cream cone. The standard of care required of such dissimilar individuals in obviously different settings would not be the same. As the trial court instructed the jury—[1]

"Negligence is the failure to use reasonable care. In the case of a child, reasonable care is that care which a reasonable child of the same age, intelligence, training and experience as Pauline Peterson at the time of the accident would have used under like circumstances."

Fourth, the Dukek case arose prior to the adoption of Minn. St. 299G.11, which requires that there be markings on clear glass doors used in public buildings. Defendants' violation of such a statutory duty could constitute the kind of negligence not found to exist in Dukek. Finally, Dukek was decided prior to Minnesota's adoption of the comparative negligence doctrine. The court in Dukek held that plaintiff was guilty of contributory negligence as a matter of law and thus was required to direct that judgment be entered for defendant. In the instant case, the contributory negligence of Pauline (assessed at 10 percent by the jury) does not defeat her claim since the defendants' negligence was found to be considerably greater.

Similarly, reliance on Munoz and Stapleman is misplaced. Munoz involved an adult who slipped on a pool of water some 20 feet square in defendant's store. The testimony established that the hazard was in plain view and obvious to all other passersby. The court said (293 Minn. 434, 196 N. W. 2d 922):

---

[1] See, Minnesota Jury Instruction Guides, Instruction 104. No exception to this instruction was taken.

"* * * On this record, it is undisputed that had she been looking she would have seen the wet area before she entered it." In Stapleman v. St. Joseph the Worker, *supra*, an adult tripped over a coatrack which she had passed earlier that evening. The court entered judgment for plaintiff and this court reversed, again because the rack was in plain sight. Plaintiff was clearly negligent in failing to observe and avoid the coatrack while there was no evidence that defendant had violated any duty imposed upon it. In the instant case, defendants did violate the statutory duty to place markings on the clear glass door. Moreover, the hazard was not in plain sight of plaintiff. Unlike the pool of water and the coatrack, a clear glass door may easily go unobserved.

In Giordano v. Mariano, 112 N. J. Super. 311, 317, 271 A. 2d 20, 23 (1970), the court reviewed cases from many jurisdictions involving injuries resulting from collisions with glass doors, concluding:

"These cases should not be read to mean that every time a licensee walks through a glass door a jury question is presented. Undoubtedly, situations will occur where plaintiff's failure to observe is so patent that no different conclusion could be reached. What these cases do indicate is that courts, reviewing evidence similar to that adduced in the instant case, i. e., *a pattern of an open door, lack of markings, poor lighting, age of the injured party, have found a jury determination appropriate.*" (Italics supplied.)

The New Jersey court found that a jury question existed even under a contributory negligence theory. In a comparative negligence state, the inappropriateness of holding, as a matter of law, that plaintiff's negligence must exceed that of defendant's, is obvious.

■ Defendants' second argument relates to the applicability of Minn. St. 299G.11 to the Chisholm Dairy Queen. Section 299G.11 provides:

"If doors or side lights of a public building, whether privately

or publicly owned, are constructed with clear glass, markings shall be placed on such clear glass or the clear glass shall be manufactured with markings. Side lights are defined as the clear glass panels not less than 15 inches wide immediately adjacent to the door."

It is contended that places of refreshment are not "public buildings" and thus it was error to instruct the jury that negligence could be predicated on violation of that statute. In the interpretation of statutes, the courts are required to discover and effectuate legislative intent, to consider objects which the legislature seeks to accomplish by the statute and the mischief sought to be remedied, and to avoid a result which would be absurd or would do violence to the language of the statute. Grushus v. Minn. Min. & Mfg. Co. 257 Minn. 171, 100 N. W. 2d 516 (1960); Wichelman v. Messner, 250 Minn. 88, 83 N. W. 2d 800 (1957). As modern architectural design incorporates more glass and aluminum into the construction of public buildings, the danger of creating hazards of "open-space illusion" increases. With this in mind, the legislature enacted L. 1967, c. 174, § 1, entitled, in part, "An Act Relating to Public Safety" and now coded as Minn. St. 299G.11. All public buildings, whether publicly or privately owned, were required to have markings placed on clear glass doors and side lights.

In spite of this broad language, defendants argue that the legislature intended only a narrow scope for the new law, following three lines of reasoning to support their position. First, defendants contend that if the legislature had wished to regulate buildings such as the Chisholm Dairy Queen, it would have done so under Minn. St. c. 157, the chapter dealing with hotels, resorts, and restaurants. The simple answer to this contention is that the legislature intended its enactment to apply to *all* public buildings, not merely those enumerated in c. 157. Second, defendants contend that the term "public buildings" includes only those set forth in § 299G.01. We note that c. 299G does not comprise an integral whole. Sections 299G.01 through 299G.08 progress in

an orderly fashion from classification of buildings for purposes of fire emergency equipment to enforcement and penalties for lack of proper equipment. On the other hand, §§ 299G.10 and 299G.11 concern doors, a topic different from the preceding sections, but still within the general subject of c. 299G, public safety. It appears that the section here under examination was intended to be considerably broader in scope than any of the preceding sections. Third, defendants point to the legislative history of § 299G.11 in support of their argument that the term "public buildings" was to have a narrow interpretation. The provisions found in § 299G.11 were originally introduced as an amendment to § 299G.10 before emerging as a separate section in its present form. To us, this history lends weight to the view that "public buildings" was intended to have a broad interpretation. Were it not so, the legislature would have restricted the term's scope by defining the term specifically, as it did in § 299G.10, or merely by adding the new provision to § 299G.10. It did neither. In addition, our sister court, in interpreting its safe-place statute, has held that restaurants are "public buildings." Kinney v. Luebkeman, 214 Wis. 1, 252 N. W. 282 (1934). Thus, in view of the problem sought to be remedied by § 299G.11, we hold that the Chisholm Dairy Queen is a "public building" within the meaning of said statute. This holding is consistent with the legislature's definition of "public buildings" in the recently enacted § 299G.13, which specifically includes restaurants.

■ Defendants next argue that § 299G.11 is unconstitutionally vague in that it fails to define the kind of markings required.

A preliminary question is raised as to whether appropriate notice was given to the attorney general so as to permit consideration of the constitutional argument. The required notice was filed after trial, but before defendants' motion for a new trial or judgment notwithstanding the verdict was heard. The attorney general did file a brief on the constitutional issue with the trial judge, supplying the input which the notice require-

ment is meant to insure. As the trial judge found the statute to be constitutional, the issue is properly before us on appeal. Peterson v. Board of County Commrs. 298 Minn. 124, 213 N. W. 2d 631 (1973).

Turning to the merits of the argument, we are in accord with Judge Chanak's determination of the statute's constitutionality and particularly with the following reasoning expressed in his memorandum:

"The duty created by Minn. Stat. Sec. 299G.11 (1971) may be analogized to a number of the common law rules relating to the duties which a landowner owed to those who came upon his land. For example, one such rule was that landowners owed a duty to warn 'constant trespassers' of known artificial dangers. Whether or not an individual fulfilled this duty depended, of course, on the particular facts of each case. The 'duty to warn' was never considered to be so vague as to be impossible to meet; rather the issue presented in such a case was whether the landowner took reasonable steps to communicate the required warning. The provisions of Minn. Stat. Sec. 299G.11 (1971) create a duty to warn of the presence of the clear glass doors and side lights which come within the purview of the statute. The only practical way of meeting such a duty is to mark such doors and side lights in such a manner as to make their presence evident. Once such steps are taken, the issue becomes whether the steps taken to mark the glass were reasonable under governing circumstances.

\* \* \* \* \*

"In its construction of statutes, our Supreme Court has made it clear that a statute will not be struck down for vagueness unless it is absolutely incapable of any reasonable construction. In *Wichelman v. Messner* [250 Minn. 111, 83 N. W. 2d 819, the court adopted the following statement]:

" '\* \* \* In short, legislation otherwise valid will not be judicially declared null and void on the ground that the same is unintelligible and meaningless unless it is *so imperfect* and *so deficient* in its details as to render it impossible of execution and en-

forcement, and is susceptible of no reasonable construction that will support and give it effect, and the court finds itself unable to define the purpose and intent of the legislature.'

250 Minn. at 111. (Emphasis added.) Under this rule, there can be no doubt as to the validity of Minn. Stat. Sec. 299G.11 (1971). A reasonable construction of that statute requires only that steps be taken to make the existence of the glass doors and side lights of public buildings readily discernible. * * *

* * * * *

"Defendants also contend that the court refused to define the term 'markings'. Both counsel will recall that at the conclusion of the testimony and while discussing instructions the court invited counsel to submit a proposed instruction defining 'markings'. Neither responded. During its charge the court, after reading M.S.A. 299G.11 to the jury, did instruct as follows (counsel were informed of this instruction prior to their final arguments) :

" 'The Chisholm Dairy Queen is a public building within the meaning of the statute. The statute does not define the word "markings". Any type of marking on the clear glass itself which will cause the clear glass to be discernible or distinguishable, in contrast to the clear glass, to an ordinary reasonable person or child patronizing the Dairy Queen through the door involved, will meet the requirement of the statute.' "

The explanatory instruction given by the trial court clearly informed the jury of the standard which the statute imposes. We additionally note that defendants placed no markings of any kind on the glass door so that there is no question of whether defendants failed to appreciate that their conduct would not meet statutory requirements.

■ As to the fourth issue raised by defendants, we hold that the trial court properly handled the difficult and unexpected problem which faced it. The jury in its initial answers to the special interrogatories found both defendants negligent, but also

found that their negligence was not a direct cause of the accident. Contrary to instructions, the jury proceeded to apportion fault among the defendants and plaintiff Pauline Peterson, concluding that the two defendants were 90-percent responsible and Pauline was 10-percent responsible. Defendants contend that the trial court should have ordered judgment in their favor based on the findings of no direct cause and that it was error to resubmit the case to the jury for further deliberation.

The central problem facing the trial judge was how to deal with the jury's apportionment of negligence in Question 11. Clearly, given its answers to the first 10 questions, the jury was not to have answered Question 11. Defendants argue that the court should have totally disregarded the answer to Question 11 as mere surplusage because the jury decided the liability issue in defendants' favor. Plaintiffs argue that the answer to Question 11 reflects the jury's findings of negligence and direct cause on the part of defendants and indicates that the jury intended to find in favor of plaintiffs. The trial court recognized that both sides could make strong arguments that the jury's answers should result in judgment in their favor, but found such a situation indicative of the basic inconsistency of the answers. In the opinion of the trial judge, the inconsistent answers and the questions submitted to the court by the jury indicated a misunderstanding and confusion on the jury's part. Rather than take away the jury's function and direct a verdict for one party or the other, the court reinstructed the jury on direct cause, deleted certain confusing language, and sent the jury back for further deliberation.

It has been held that a court has the same authority to set aside an answer to a special interrogatory where a special verdict is used as it has to grant judgment notwithstanding the verdict. Hill v. Wilmington Chemical Corp. 279 Minn. 336, 156 N. W. 2d 898 (1968). Thus, the trial judge had the power to disregard the jury's answers to Questions 2 and 8 and enter judgment for plaintiffs. Had the jury answered a general verdict along with

its special interrogatory answers, the trial judge could either have ordered a new trial or sent the jury back for further deliberations. Rule 49.02, Rules of Civil Procedure. We hold that the course selected by the trial court was the appropriate one under the circumstances of this case also. It was clearly shown by its answers to the special interrogatories and its questions to the court that the jury was considerably confused as to direct cause. To enter judgment for defendants in such a case would be to ignore the realities of the situation. The trial judge should consider the surrounding circumstances in disregarding the inconsistent answers of the jury and in sending them back for further deliberations.

The last issue raised by defendants is without merit. This argument is premised on the assumption that the jury had no question concerning direct cause until after being advised by Judge Chanak for the second time that their answers were inconsistent. This is contrary to the facts since it is clear that the questions submitted by the jury were prepared before it was called back by Judge Chanak. Nor do we perceive any error in Judge O'Brien's statement that the answers appeared inconsistent to him since in fact they were inconsistent.

Affirmed.