NEWMECH COMPANIES, INC.,
Respondent (C1–93–1500),

v.

INDEPENDENT SCHOOL DISTRICT
NO. 206, ALEXANDRIA, Minnesota,
Petitioner, Appellant (C1–93–1500),

Manning Mechanical, Inc., a North Dakota corporation, Petitioner, Appellant
(C1–93–1500), Defendant (C8–93–1509),

State of Minnesota, Intervenor, Respondent (C1–93–1500), Intervenor Below (C8–93–1509).

Scott ANDERSON, et al., Petitioners,
Respondents (C8–93–1509),

v.

INDEPENDENT SCHOOL DISTRICT
NO. 206, ALEXANDRIA, Minnesota,
Petitioner, Appellant (C8–93–1509).

Nos. C1–93–1500, C8–93–1509.

Supreme Court of Minnesota.

Oct. 6, 1995.

Rehearing Denied Dec. 5, 1995.

John C. Lervick, Alexandria, for ISD No. 206.

LaDonne R. Vik, Brad A. Sinclair, Fargo, ND, for Manning Mechanical, Inc.

Gerald S. Duffy, Rosemary Tuohy, Minneapolis, for NewMech Companies, Inc.

Stephen D. Gordon, Paul W. Iverson, Minneapolis, for Scott Anderson, et al.

Hubert H. Humphrey, Attorney General, Scott R. Strand, Assistant Attorney General, St. Paul, for State of Minn.

Gregg J. Cavanagh, Minneapolis, for Amicus Curiae, MN Chapter of Assoc. Builders.

James E. Knutson, Stephen M. Knutson, Marie C. Skinner, St. Paul, for Amicus Curiae, MN School Boards Assoc. and ISD No. 206.

## OPINION

ANDERSON, Justice.

This case arises from lawsuits filed by NewMech Companies, Inc. and the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 126, and three of its members, Scott Anderson, Ron Haarstad and Leonard Johnson (Local 126). The plaintiffs alleged Independent School District No. 206 (the District) violated the Prevailing Wage Act (the PWA), Minn.Stat. §§ 177.41–.44, by failing to require payment of the prevailing wage on the mechanical contract for the construction of a new junior high school building in Alexandria, Minnesota. Manning Mechanical, Inc. was the low and successful bidder on the mechanical contract for the school construction project. NewMech was the second low bidder. Local 126 represents the plumbers and pipefitters employed by NewMech for all its plumbing and pipefitting work.

NewMech and Local 126 filed separate lawsuits against the District on June 14, 1993. NewMech's complaint also named Manning as a defendant. Each plaintiff alleged the PWA applied to the school construction project because the project was financed at least in part by state funds, specifically, Debt Service Equalization Aid (DSEA)[1] and Homestead and Agricultural Credit Aid (HACA).[2] The plaintiffs sought, among other things, a permanent injunction against performance of the mechanical contract.

The trial court issued a temporary restraining order on June 16 enjoining the District and Manning from performing the project's mechanical contract. After a hearing, the trial court concluded the District's receipt of DSEA and HACA did not result in the project being financed in whole or part by state funds, and dismissed both complaints. The court also concluded Local 126 did not have standing to challenge the mechanical contract.

NewMech's and Local 126's appeals were consolidated, and the Minnesota Court of Appeals held the District's receipt of DSEA

---

1. The Debt Service Equalization statutes provide for the reduction of a qualified school district's debt service levy—the tax a school district is required to assess to pay its debt owing on bonds, Minn.Stat. § 475.61, subd. 1 (1994)—by providing state funds to that district to help it make debt payments. Minn.Stat. §§ 124.95–.97 (1992). The purpose of debt service equalization is to ease the property tax burdens of school districts that have substantial debt service and moderate to low tax bases. The District will receive DSEA because of its increase in debt due to the school construction project.

2. The Homestead and Agricultural Credit statute, Minn.Stat. § 273.1398, subd. 5 (1992) (amended in 1993 to move the relevant language to subds. 1 and 2), provides qualified real estate owners a credit for a portion of their property taxes assessed by school districts. *Id.* The state then gives each school district money, called HACA payments, to replace the tax revenue each lost because of the credits. *Id.* The purpose of HACA is to provide property tax relief to residential and agricultural property owners. The District receives HACA payments for its debt service levy.

resulted in the project being financed in part by state funds. Because it concluded DSEA payments received by the District constituted state financing of the school construction project, the court of appeals did not reach the issue of whether HACA payments to the District constituted state financing. In addition, the court of appeals affirmed the trial court's determination that Local 126 lacked standing to challenge the mechanical contract.

■ We are asked to review three issues: (1) whether the District's receipt of DSEA or HACA payments constitutes state financing of the school construction project within the purview of the PWA; (2) whether Local 126 has standing to challenge the project's mechanical contract; and (3) if the PWA does apply to the project, whether our decision should have only a prospective effect, and should not apply to the parties in this case. DSEA or HACA payments to a school district are intended to provide property tax relief to taxpayers, not to pay for or subsidize construction costs. We hold, therefore, that DSEA or HACA payments to the District do not constitute state financing of the school construction project within the meaning of the PWA, and we reverse.

At issue in this case is the source of financing for the construction of a new junior high school by Independent School District 206. The construction project was expected to cost almost $16 million. Project-specific state aid, in the form of grants or loans, and nonproject-specific state aid, such as capital expenditure aid, is sometimes available to assist a school district in paying the costs of constructing a new school building. Minn. Stat. § 124.243 (1994); Minn.Stat. § 124.431 (1994); Minn.Stat. §§ 124.491–.495 (1994). The District, however, did not receive either type of state assistance on this construction project. Instead, to raise the money needed to construct the new school, the voters of the District approved the issuance of general obligation tax exempt bonds totalling $15,-888,000. The District sold bonds in that amount and thereby raised all the funds necessary to finance the construction project.

The Prevailing Wage Act, Minn.Stat. § 177.41 (1994), sets forth the policy supporting the statute:

It is in the public interest that public buildings and other public works be constructed and maintained by the best means and highest quality of labor reasonably available and that persons working on public works be compensated according to the real value of the services they perform. It is therefore the policy of this state that wages of laborers, workers, and mechanics on projects financed in whole or part by state funds should be comparable to wages paid for similar work in the community as a whole.

■ A "project" means "erection, construction, remodeling, or repairing of a public building or other public work financed in whole or in part by state funds." Minn.Stat. § 177.42, subd. 2 (1994). The PWA does not define the term "financed." Because violation of the PWA is a misdemeanor, Minn. Stat. § 177.43, subd. 5 (1994), it is a penal statute and therefore its terms must be narrowly or strictly construed so as not to go beyond the clear meaning or definite scope of the statute. *Beck v. Groe*, 245 Minn. 28, 34, 70 N.W.2d 886, 891 (1955); *Anderson v. Burnquist*, 216 Minn. 49, 11 N.W.2d 776 (1943); *cf. Muskegon Bldg. and Constr. Trades v. Muskegon Area Intermediate Sch. Dist.*, 130 Mich.App. 420, 343 N.W.2d 579, 587 (1983) (narrowly construing Michigan's prevailing wage law, containing language virtually identical to Minnesota's PWA, because it contained penal provisions).

The term "financed" must be defined according to its common and approved usage in accordance with the applicable rules of statutory construction. Minn.Stat. § 645.08(1) (1994). The trial court noted that Webster's *New Lexicon of the English Language Dictionary* defines the verb "finance" as follows: "to provide with money for; to raise the money for." *New Lexicon Dictionary*, p. 352 (1988 ed.). The court reasoned that the "financing" for the project at issue here, the new junior high school, was accomplished by "raising the money for" its construction. The District raised the money for construction by selling bonds. Raising money for

construction of a specific project, such as a new school building, is different from receiving money year by year to pay the principal and interest due on a school district's outstanding debt. The court found that in order to be used "in whole or in part" to finance a project, state funds must be available to be spent at the time the construction project's costs are incurred.

We agree with the reasoning of the trial court. DSEA or HACA, scheduled to be received in a later period, are not available at the time the project's costs are incurred. The term "financed" thus contemplates a direct relationship between the funding and the project. Funding that lacks this direct relationship to the project does not qualify as "financed in whole or in part by state funds" under the PWA. Statutes governing project-specific construction grants or loans and the statute governing capital expenditure aid demonstrate that, to establish this direct relationship and thereby constitute financing for purposes of the PWA, state funds must be available at the time of construction to pay directly the costs of constructing the project. See Minn.Stat. § 124.243; Minn.Stat. § 124.431; Minn.Stat. §§ 124.491–.495; see also Faribault County v. Minnesota Dept. of Transportation, 472 N.W.2d 166, 167 (Minn.App.1991) (holding that money awarded from state highway fund and municipal street fund triggers the PWA because such money directly pays construction costs on road projects), pet. for rev. denied (Minn., Aug. 29, 1991).

The District's resolution authorizing the sale of the bonds requires that "[m]oney in the Debt Redemption Fund shall be used for no purpose other than payment of principal and interest on obligations of the [District], including Bonds issued pursuant to this resolution." The resolution further provides that "all monies received for or appropriated to the payment of the bonds and interest thereon shall be paid into the Debt Redemption Fund." These provisions are included in the District's resolution pursuant to Minn.Stat.

§ 475.61, subd. 1 (1994), which requires that the bond "resolution should irrevocably appropriate the taxes so levied and any special assessments or other revenues so pledged to the [school district's] debt service fund or a special debt service fund or account created for the payment of one or more issues of obligations." "Debt service fund" is defined as "any money and investments in the treasury of a [school district] appropriated to pay the principal, interest or premiums for the redemption of *any of its obligations*." Minn. Stat. § 475.51, subd. 6 (1994) (emphasis added).

The DSEA program provides property tax relief to taxpayers by providing eligible school districts with state aid to help repay the bonds that are issued to pay the costs of construction. DSEA payments must be placed in a debt service fund (debt redemption fund) and may be used only to reduce the school district's debt service levy and to pay the principal and interest on obligations[3] of the District for eligible projects; they may not be used to pay costs of a construction project. Further, allocation of DSEA payments to a debt service fund does not mean that those payments will be applied to pay any specific obligation. The indirect relationship between DSEA payments and the construction project precludes the conclusion that such payments "financed" the construction project within the meaning contemplated by the PWA. *See Wells v. Correctional Facilities Constr. Auth.*, 730 S.W.2d 951 (Ky.Ct. App.1987) (distinguishing between the proceeds obtained through the sale of revenue bonds and the state funds used to repay the bonds, the court concluded that a project funded by the bond proceeds was not financed by state funds, and consequently, the state prevailing wage act did not apply).

The present situation is analogous to financing the construction of or buying a new home. The prospective homeowner borrows the money to build or purchase the home from a commercial lender, such as a bank or

---

**3.** "Obligation" is defined as "any promise to pay a stated amount of money at a fixed future date or upon demand of the obligee, regardless of the source of funds to be used for its payment, made for the purpose of incurring debt, including the purchase of property through an installment purchase contract or any other deferred payment agreement, for which funds are not appropriated in the current year's budget." Minn.Stat. § 475.51, subd. 3 (1994).

mortgage company. The loan proceeds from the commercial lender finance the construction or acquisition of the home. Future payments on the loan are made with funds from various sources, commonly including the homeowner's salary or wages. It is unreasonable to conclude that the homeowner's employer, who pays the salary or wages, financed the home's construction or acquisition.

Further, the conclusion that DSEA payments trigger the requirements of the PWA creates the anomalous situation in which wealthy school districts, ineligible to receive DSEA, but financially better able to undertake construction projects and pay prevailing wages, are not subject to the PWA, while relatively poorer school districts receiving DSEA, financially less able to afford prevailing wages, are subject to the PWA.

A comparison with the Financial Assistance Limitations Act (FALA), Minn.Stat. § 116J.871 (1994), is instructive in determining whether the legislature intended DSEA payments to trigger the requirements of the PWA. Under qualifying circumstances, FALA provides state grants and loans for state economic development projects. In FALA, the legislature *explicitly specified* that the prevailing wage is required for qualifying contracts that receive assistance under this statute. Minn.Stat. § 116J.871, subd. 2. In significant contrast, when the legislature enacted the DSEA statute only one year after it enacted FALA, it declined to include any provision requiring the payment of prevailing wages as a result of receiving DSEA.

The HACA program replaces the former homestead and agricultural credit aid programs, and provides property tax relief to homestead and agricultural property. Like DSEA payments, HACA payments bear no direct relationship to a particular construction project. Nothing in the legislative history of HACA supports the conclusion that receipt of HACA payments was intended to trigger the PWA. As the trial court points out, every school district, municipality and county in Minnesota receives HACA payments—a form of tax relief that has been available since 1967. The PWA has been in effect since 1973. Each statute has been amended, HACA frequently; but never in the past 22 years has the legislature specifically provided that HACA payments trigger the requirements of the PWA. Because the legislature has not taken this step, we decline to do so.

Because DSEA and HACA payments do not bear a direct relationship to a particular construction project, we conclude that the meaning of "financed in whole or in part by state funds" does not encompass state aid payments to school districts through DSEA or HACA within the purview of the PWA. Because we hold state aid payments to the school district do not constitute "financing" a project in whole or in part by state funds, we need not decide whether Local 126 has standing to challenge the contract or whether the PWA would apply prospectively.

Reversed.

PAGE, Justice (dissenting).

I respectfully dissent. I believe that the clear and unambiguous language of the Prevailing Wage Act (PWA), coupled with the statutory requirements for receipt of Debt Service Equalization Aid (DSEA), leave no doubt that Independent School District 206's construction of the new junior high school building was financed at least in part by state funds within the meaning of the PWA.

Minn.Stat. § 177.41 (1994) reads as follows:

> It is in the *public interest* that public buildings and other public works be constructed and maintained by the best means and highest quality of labor reasonably available and *that persons working on public works be compensated according to the real value of the services they perform.* It is therefore *the policy of this state that wages* of laborers, workers, and mechanics *on projects financed in whole or part by state funds* should be comparable to wages paid for similar work in the community as a whole.

(Emphasis added.)

In this case, we are asked to decide whether the District's receipt of DSEA payments from the state, triggered by the junior high school construction project, resulted in the

project being financed in whole or part by state funds. To make that decision, we must determine the meaning of the term "financed" as it is used in the statute. *Webster's Third New International Dictionary* 851 (1993 ed.) defines "finance" as follows: "1: to raise or provide funds or capital for * * * 2: to provide with necessary funds in order to achieve a desired end." *See Needles v. Kansas City,* 371 S.W.2d 300, 305 (Mo. 1963) (using *Webster's New International Dictionary* to define "finance"). *See also The New Lexicon Webster's Dictionary of the English Language* 352 (1989 ed.) (defining "finance" as: "to raise the money for").

When interpreting a statute, we must give effect to the intention of the legislature. *Peterson v. Haule,* 304 Minn. 160, 170, 230 N.W.2d 51, 57 (1975). We are required to construe technical words according to their technical meaning and other words according to their common and approved usage and the rules of grammar. Minn.Stat. § 645.08 (1994). When the language of a statute, so construed, is not ambiguous, we must apply the statute's plain meaning. *McCaleb v. Jackson,* 307 Minn. 15, 17 n. 2, 239 N.W.2d 187, 188 n. 2 (1976). There is no need for judicial construction when a statute is clear and unambiguous. *Arlandson v. Humphrey,* 224 Minn. 49, 54–55, 27 N.W.2d 819, 823 (1947). Indeed, where the language of the statute is clear and unambiguous, there is no place for such construction.

The court, engaging in statutory construction, concludes that the PWA is penal in nature and, therefore, must be interpreted narrowly. However, because the language of the PWA is clear and unambiguous, the court should not engage in statutory construction. *Id.* Further, the section of the PWA which we are concerned with, Minn.Stat. § 177.41, is a remedial provision and is not penal in nature. The penal provision of the PWA is found in section 177.43, subd. 5. "Where a statute contains remedial and penal provisions, the former are to be construed liberally and the latter strictly." *State v. Moseng,* 254 Minn. 263, 269, 95 N.W.2d 6, 11 (1959). Thus, if the court is to engage in statutory construction, section 177.41 should be construed liberally.

Under any reading of the PWA, the DSEA payments received by the District from the state provide funds for the junior high school construction project. To conclude otherwise, one would have to conclude that the property tax (debt service levy) levied on the district's property to pay for the junior high school construction project was not a part of the project's financing. Based on the steps taken by the district, that conclusion cannot be reached. The District raised the money for the junior high school construction project through an integrated plan to sell and repay bonds. The bonds were to be repaid by the money raised from the debt service levy. Minn.Stat. § 124.97 (1994). The debt service levy was the only source available for repaying the bonds and, without it, the bonds could not have been sold and the junior high school would not have been built. As a result of the debt created by the project, the District receives DSEA payments in lieu of money it would otherwise have to raise through the debt service levy. Absent receipt of the DSEA payments, the District would have had to increase its debt service levy to repay the bonds. Therefore, the DSEA payments the District receives, in lieu of money raised through the debt service levy, provide funds for the District to repay the bonds with the result that the junior high school construction project was financed in part by state funds.

The court contends that "the term 'financed' * * * contemplates a direct relationship between the funding and the project" and that funds not available at the time the project's costs are incurred cannot constitute financing. However, there is nothing, either in the common and approved definition of the word "finance" or in the PWA, which states, suggests, or requires that the funds needed to finance a project covered by the PWA be available at the time the construction costs are incurred. Even if that requirement is imposed, it is clear that the DSEA payments financed the school construction project. The voters of the District approved the sale of the bonds for the junior high school construction project on April 28, 1992, and on May 18, 1992, pursuant to the resolution providing for the sale of the bonds, the Dis-

trict levied the necessary property tax for repayment of the bonds.[1] The bonds were issued and sold in June of 1992. Construction contracts for the junior high school building were not awarded until April 1993. Thus, the entire finance package, including the levying of property taxes triggering the District's entitlement to DSEA payments, was in place and available for use well before any bids on the project were accepted and before any construction costs were incurred. This represents a direct relationship between the funds raised for the project and the project itself.

The best evidence that the District's receipt of DSEA payments from the state constitutes part of the financing for the new junior high school building is found in the District's resolution awarding the sale of the bonds for the project. That resolution requires "all taxes levied pursuant to this resolution * * * and all monies received for, or appropriated to the payment of the Bonds and interest thereon shall be paid into the [District's] Debt Redemption Fund."[2] According to the District's superintendent, Dr. Cassell, the District receives DSEA in lieu of money raised by its debt service levy and must use the DSEA as it would the money raised by its debt service levy. Minn.Stat. § 475.61, subd. 1 (1994) requires a school district to place money raised by a debt service levy, and all "other revenues pledged for the payment" of the bonds, in its debt redemption fund. Thus, proceeds from the debt service levy approved by the District's voters and all DSEA payments received by the District in lieu of the debt service levy are required to be placed in the debt redemption fund for repayment of the bonds.

The court analogizes the situation presented in this case to the homeowner who finances the construction or acquisition of a new residential home with a loan from a commercial lender and repays that loan from various sources, including the homeowner's salary or wages. The purpose of the analogy is to suggest that it is unreasonable to conclude that the homeowner's salary/wages financed the home's construction/acquisition and that it is equally unreasonable to conclude that the DSEA payments received by the District financed the junior high school construction project. The problem with this analogy is that the two situations are not analogous. In the case of the homeowner, the employer pays the salary/wages and the employee/homeowner may use the salary/wages for any purpose. While the salary/wages may be used to repay the commercial lender, it may also be used for food, clothing, entertainment, transportation, or anything else the homeowner chooses. The District has no such choice. The District is required by school board resolution and by Minn.Stat. § 475.61, subd. 1, to place the DSEA payments it receives into its debt redemption fund to be used solely for the purpose of repaying the bonds issued as a result of the school construction project.

The court also compares the DSEA statute enacted in 1991 with the Financial Assistance Limitations Act (FALA) enacted in 1990, and concludes that the legislature did not intend the DSEA statute to implicate the PWA because the DSEA statute, unlike FALA, does not expressly require recipients of money under its provisions to comply with the Act. This argument is unpersuasive. In essence, the court contends that because the legislature did not expressly require compliance with the PWA in the DSEA statute, this court must find the PWA inapplicable. The argument could just as easily be made that because the legislature did not expressly permit noncompliance with the PWA in the DSEA statute, the PWA must be applicable.

1. The District levied a tax for each levy year, beginning with levy year 1992 and ending with levy year 2011, sufficient to repay its annual obligation on the bonds. Each of the levies was irrevocable.

2. Resolution for the sale of General Obligation School Building Bonds, Series 1992A, § 5.01, Minutes of Independent School District No. 206 School Board Meeting (June 8, 1992). The debt service fund (the debt redemption fund) is the account of money and investments held by the school district, and may only be used to pay for the redemption of its issued bonds. Minn.Stat. § 475.51, subd. 6 (1992); Reporting Standards Comm., Minn. Dep't of Educ., *Manual for the Uniform Financial Accounting and Reporting System for Minnesota Schools* III–6 (1981 ed.).

The court suggests that application of the PWA on the basis of DSEA creates an anomalous situation in which the relatively poor school districts receiving DSEA are subject to the PWA, but wealthy school districts, ineligible to receive DSEA, are not subject to the PWA. When interpreting a statute, we must presume the legislature did not intend an absurd or unreasonable result. Minn. Stat. § 645.17 (1994). Though it might be argued that application of the PWA on the basis of DSEA has an unusual effect upon poor school districts, this effect is not necessarily absurd or unreasonable. It is not this court's place to decide whether policy set by the legislature is good or bad. The legislature has stated the clear public policy that "public buildings and other public works be constructed and maintained by the best means and highest quality of labor reasonably available and that persons working on public works be compensated according to the real value of the services they perform," and that "laborers * * * on projects financed * * * in part by state funds" be paid the prevailing wage. Minn.Stat. § 177.41 (1994). It is for the legislature, not this court, to decide the public policy of this state. The legislature has done so here.

TOMLJANOVICH, Justice (dissenting).

I join in the dissent of Justice PAGE.

GARDEBRING, Justice (dissenting).

I join in the dissent of Justice PAGE.