**COLOR–AD PACKAGING, INC., Respondent,**

v.

**COMMISSIONER OF REVENUE, Relator.**

No. C8–87–2103.

Supreme Court of Minnesota.

Sept. 16, 1988.

Hubert H. Humphrey, III, State Atty. Gen., David T. Schultz, Sp. Asst. Atty. Gen., St. Paul, for relator.

Christopher J. Chaput, Minneapolis, for respondent.

COYNE, Justice.

The issue presented is whether the capital equipment tax reduction program of chapter 297A applies to future goods ordered prior to the statute's effective date but not delivered or placed into service until after that date. The Commissioner of Revenue concluded it did not and denied respondent Color–Ad Packaging's claim for a refund. Color–Ad appealed and the Tax Court allowed the refund, holding that under the program both the purchase and sale of future goods occurs at the time of delivery. We affirm.

The parties have submitted the case on stipulated facts. Respondent Color–Ad Packaging Company, Inc. is engaged in the printing business in St. Louis Park, Minnesota. In December 1983, Color–Ad ordered a slitter rewinder from a firm in the United Kingdom by telephone. The order was confirmed by a written purchase order in February 1984. Two months later, in April 1984, Color–Ad ordered a gravure coating station from a company in Green Bay, Wisconsin.

The slitter rewinder was manufactured after June 30, 1984, and was shipped, assembled and placed into service at Color–Ad's place of business after August 1985. The gravure coating station was manufactured after June 30, 1984, and was later, in August 1985, delivered, assembled, and placed into service at Color–Ad's place of business.

The Minnesota General Sales Tax Law, Minn.Stat. §§ 297A.01 through 297A.44, embodies a comprehensive tax system created to impose an excise tax on the sale, use, storage, or consumption within Minnesota of tangible personal property and certain other commodities and services. The statutes provide two taxes, sales and use, which are mutually exclusive, but complementary, and which are designed to exact

an equal tax based on a percentage of the purchase price of the property in question. It has been said that, in essence, a sales tax is a tax on the freedom of purchase, and a use tax is a tax on the enjoyment of that which was purchased. *Wallace Berrie & Co. v. State Bd. of Equalization*, 40 Cal.3d 60, 66, 707 P.2d 204, 209, 219 Cal.Rptr. 142, 147 (1985).

The sales tax provision reads: "Except as otherwise provided in this chapter, there is imposed an excise tax of six percent of the gross receipts from sales at retail made by any person in this state." Minn.Stat. § 297A.02, subd. 1 (1986). The section providing for the imposition of a use tax states:

> For the privilege of using, storing or consuming in Minnesota tangible personal property, tickets or admissions to places of amusement and athletic events, electricity, gas, and local exchange telephone service purchased for use, storage or consumption in this state, a use tax is imposed on every person in this state at the rate of six percent of the sales price of sales at retail unless the tax imposed by section 297A.02 was paid on the sales price. * * *

Minn.Stat. § 297A.14 (1986).

Both sections 297A.02 and 297A.14 provide that, notwithstanding the foregoing provisions, the rate of the excise tax imposed upon sales and the use tax imposed upon the sales price of capital equipment is four percent. Minn.Stat. §§ 297A.02, subd. 2 and 297A.14 (1986). The tax on capital equipment is so structured that the tax is paid at the rate of six percent and the purchaser applies for a refund equal to the two percent reduction as a result of the lower rate payable on capital equipment. Minn.Stat. § 297A.15, subd. 5 (1986). The reduction in the tax rate became effective with respect to "sales made after June 30, 1984, and also * * * to purchases of capital equipment and special tooling made after May 1, 1984, but not placed in service until after June 30, 1984." Act of April 25, 1984, ch. 502, art. VI, § 11, 1984 Minn. Laws 492, 564.

The Commissioner contends that the reduction in the tax rate on capital equipment was to "encourage new investment in capital equipment" and that Color–Ad should not be entitled to a rebate because its capital equipment orders were placed prior to the effective date for the statutory refund. The Tax Court concluded, however, that a "purchase" does not occur on the placement of an order for future goods but upon delivery of the completed goods. Color–Ad confirmed its telephone order of a slitter rewinder from a firm in the United Kingdom in February 1984 by written purchase order, and in April 1984 Color–Ad ordered a gravure coating station from a firm in Green Bay, Wisconsin. Neither piece of capital equipment, however, was manufactured before July 1, 1984, the effective date for the statutory refund, and then neither was shipped or delivered, assembled, or placed in service at Color–Ad's place of business before August 1985. Since both items of capital equipment were delivered after the June 30, 1984 effective date, the Tax Court ruled that Color–Ad was entitled to the two percent refund provided in section 297A.15, subd. 5.

That liability for the sales tax accrues at the time of the sale is not only apparent from the language of section 297A.02, but has been recognized in such cases as *Leisure Dynamics, Inc. v. Falstaff Brewing Corp.*, 298 N.W.2d 33, 37 (Minn.1980), and is not disputed here. In *Crown Iron Works Co. v. Comm'r of Taxation*, 298 Minn. 213, 214 N.W.2d 462 (1974) (in which we were faced with the converse of the present situation), we held that a sale occurs, in accordance with the definition provided at Minn.Stat. § 297A.01, subd. 3, when transfer of title or possession, or both, of tangible personal property occurs, and we looked to the Uniform Commercial Code as adopted in this state for clarification of the term "transfer of title." We went on to point out that identification to the contract is a necessary prerequisite to the passing of title, Minn.Stat. § 336.2–401 (1986), and that where future goods are involved, as they are in the present case, appropriation of the goods to the contract must be something more than a selection

by a seller who retains the right to choose the specific article to be supplied to the purchaser. Minn.Stat. § 336.2–501 designates the manner in which identification is accomplished. Moreover, Minn.Stat. § 336.2–401(2) (1986) provides that unless otherwise explicitly agreed, title passes at the time and place at which the seller completes his performance with respect to the physical delivery of the goods. *Id.* at 216–17, 214 N.W.2d at 464–65. Thus, in *Crown Iron Works*, this court held that the sale of goods, which were ordered prior to the effective date of the sales tax statutes but delivered after the effective date of the sales tax, took place when title passed on physical delivery of the goods. Accordingly, the sales tax was properly imposed. *Id.* at 218–19, 214 N.W.2d at 466.

In the present case the purchase orders for both the slitter rewinder and the gravure coating station were for future goods which did not come into existence until after June 30, 1984. In fact, they were not delivered until more than a year after the effective date of the rate reduction in the tax applicable to capital equipment.

Had the sellers of the slitter rewinder and the gravure coating station been Minnesota retailers and the sales made in this state, thereby triggering the imposition of the sales tax (section 297A.02), the holding in *Crown Iron Works* would be dispositive: the sale occurred on transfer of title to the purchaser, an event which could not have occurred before the goods came into existence. Since the goods did not come into existence until after June 30, 1984, the purchaser should be entitled to the refund provided at section 297A.15, subd. 5.

The sales in question, however, were not made in Minnesota. The one manufacturer was located in the United Kingdom and the other in the State of Wisconsin. Color–Ad was, therefore, required to pay a use tax for the privilege of using, storing, or consuming in Minnesota tangible personal property. *See* § 297A.14 (1986). Section 297A.01, subd. 6, defines "use" as including the exercise of any right or power over tangible personal property, and we have previously noted that liability for use tax is triggered by any exercise of "the privilege of using, storing, or consuming in Minnesota tangible personal property." *Miller v. Comm'r of Revenue,* 359 N.W.2d 620, 621 (Minn.1985). Color–Ad could neither exercise any right or power nor enjoy any privilege of using, storing or consuming tangible personal property before that property came into existence. In the light of the statutory definition of "use," the provisions of Minn.Stat. § 336.2–401 (1986), and our decision in *Crown Iron Works,* the Tax Court properly determined that liability for use tax did not accrue until after July 1, 1984.

The State contends, however, that "sales" and "purchases," as those terms are used in the section of the session law providing for the effective date of the reduction in the rate of tax applicable to capital equipment, Act of April 25, 1984, ch. 502, art. VI, § 11, 1984 Minn.Laws 492, 564, have a different meaning than that provided in the statutory definition at section 297A.01, subd. 3. While it is true that the statutory definition is not exclusive and while it is also true that the portion of the statute setting the effective date of the tax reduction is somewhat inartfully phrased, nothing in that provision justifies substituting "purchase order" for "purchase," construing "sale" and "purchase" in such a way that they can occur other than simultaneously, or in any other manner departing from the established statutory and judicial definition of "sale" and "purchase." A perfectly reasonable construction of the effective date provision can be achieved by according the terms "sales" and "purchases" their customary and accepted meanings.

The reduced tax rate is applicable to any sale made after June 30, 1984, that is, when there has been a transfer after June 30, 1984, either of title pursuant to the Uniform Commercial Code, as adopted in Minnesota, or of possession. The effective date provision states that the reduced rate shall also apply to purchases of capital equipment made after May 1, 1984 if the purchaser has elected not to place the equipment in service until after June 30,

1984. In other words, this language provides an exception for a transaction which would otherwise be ineligible for the tax reduction: if the equipment is not placed in service until after June 30, 1984, the reduced rate applies as long as the transfer either of title pursuant to the Uniform Commercial Code as enacted in Minnesota or of possession occurred subsequent to May 1, 1984. It is, of course, the purchaser who must make the election whether to delay placing the equipment in service—a matter of business judgment which requires the purchaser to weigh the economic benefit to be gained from utilization of the equipment against the benefit to be derived from the tax deduction. Moreover, it is the purchaser who must declare in its application for tax refund that even though the purchase occurred between May 1, 1984 and June 30, 1984, the equipment was not placed in service until after June 30, 1984. When one considers that eligibility for the reduced rate depends on the purchaser's conduct, the shift from "sale" to "purchase" becomes explainable and the provision is unambiguous.

The State buttresses its manufactured ambiguity in the effective date provision by reference to the legislature's intention to create an incentive for, or to remove an impediment to, acquisition of capital equipment by business units for employment in Minnesota plants. We do not disagree with the State's articulation of legislative intention but only with its conclusion that the Tax Court's decision frustrates the legislative purpose. In the present case the purchase order for the capital equipment in question was, indeed, made long before the legislative decision to reduce the tax applicable to capital equipment. Neither item of equipment was delivered, however, until more than one year after the effective date of the reduction. Whatever may be the validity of Color–Ad's contention that it could have cancelled the order because the equipment was not delivered timely, it is apparent that at any time for a period of about one year after the effective date of the tax reduction, Color–Ad could have avoided the imposition of Minnesota's use tax by removing its business to another state and directing delivery of the capital equipment to its new base of operation. The legislative intention is broad enough, we assume, to include encouragement of a Minnesota business unit to remain in Minnesota. Accordingly, affirmance of the Tax Court's decision in the present case promotes the legislature's intention as well as preserves uniformity in the construction and application of the terms "sale" and "purchase."

The Tax Court's allowance of Color–Ad's claim for a refund is affirmed.

KELLEY, YETKA and POPOVICH, JJ., dissent.

KELLEY, Justice (dissenting):

When construing a statute, a court's function is to ascertain and effectuate legislative intention. In pursuit of that goal a court is not free to disregard the letter of the law when the wording of the statute is clear and free from all ambiguity. However, as a corollary to that rule, when the words of the law are not explicit, or where ambiguity exists, courts must attempt to ascertain the intention of the legislature by the application of certain statutory criteria. *See* Minn.Stat. § 645.16 (1986). Likewise, courts are authorized to employ certain presumptions in ascertaining that intention. Among those presumptions are: (1) that the legislature did not intend a result that is absurd or unreasonable; (2) that the entire statute is to be effective and certain; and (3) that the legislature intends to favor the public interest as against any private interest. *See, e.g.,* Minn.Stat. § 645.17 (1986). My examination of Act of April 25, 1984, ch. 502, art. 6, § 11, 1984 Minn.Laws 492, 564 (the Sales and Use Tax Refund Amendment), leads me to conclude the statutory wording is neither clear nor certain. Therefore, I believe we must resort to ascertainment of legislative intent by reference to statutory rules of construction and the application of statutory presumptions. When that is done, it appears clear to me that the legislature did not intend an unwarranted windfall rebate in favor of those who had placed orders of capital equipment long before the enactment or effective date

of the statute and without any reliance upon it—the result which ensues from the tax court's opinion today affirmed by the majority.[1] Therefore, I feel constrained to respectfully dissent.

The Act of April 25, 1984, ch. 502, art. 6, § 7, 1984 Minn.Laws 492, 557, codified as Minn.Stat. § 297A.15, subd. 5 (1986), authorized a two percent sales and use tax rebate on certain purchases of capital equipment. The portion of the act engendering this dispute made the rebate available to "sales made after June 30, 1984, and also * * * to purchases of capital equipment and special tooling made after May 1, 1984, but not placed in service until after June 30, 1984." Act of April 25, 1984, ch. 502, art. 6, § 11, 1984 Minn.Laws. 492, 564. The tax court concluded the language used was precise and unambiguous. In arriving at that conclusion, it relied upon this court's definition of "sale" in *Crown Iron Works Co. v. Comm'r of Taxation*, 298 Minn. 213, 214 N.W.2d 462 (1974), as the word is used in Minn.Stat. § 297A.01 (1986). We there held, for the purpose of determining the date on which the obligation to pay a sales tax arose, that by reference to Minn.Stat. § 336.2–401 (the Uniform Commercial Code) a "sale" occurred when the seller completes performance by physical delivery of the goods. Because we had defined "sale" in that context, and because the legislature had not thereafter altered the definition of "sale" as used in the tax statute, the tax court concluded that the same definition was to be read into the statute when construing an exemption, and, therefore, when that is done it concluded no ambiguity existed. The majority of this court, while acknowledging the statutory definition is not exclusive, and while admitting the statute is "somewhat inartfully phrased" proceeds, nonetheless, to the conclusion that the words "sale" and "purchase" as used in the rebate statute should be accorded their "customary and accepted" meanings.

To me the statute is not only "somewhat inartfully phrased," its wording on its face as well as in context is ambiguous. When it employed the words "sale" and "purchase," what did the legislature intend? Was its intent that "purchase" was to be construed to be synonymous with our construction of the word sale in *Crown Iron Works?* I would agree that had the legislature simply provided in the 1984 refund amendment that a sale or purchase consummated after a specified date would entitle the purchaser to a two percent rebate, that our holding in *Crown Iron Works* might be dispositive. Had the legislature so provided, no significant distinction would exist to justify application of a different definition of "sale" or "purchase" when determining the time a sale of goods to be delivered in the future becomes taxable, than when construing the maturity date giving rise to a refund claim. No ambiguity would exist, and, in my opinion, it would not be inappropriate to incorporate the judicial definition arrived at by reference to the Uniform Commercial Code definition in *Crown Iron Works*. However, that scenario is not this case. To me, the ambiguity here arises from the legislature's limitation of the refund on "sales made after June 30, 1984, and also *·* * to purchases of capital equipment * * * made after May 1, 1984, but not placed in service until after June 30, 1984." This language raises an uncertainty or ambiguity not present in the tax statute being construed in *Crown Iron Works*. In construing statutes, we are not permitted to ignore a statutory provision or to define particular statutory words out of the context of the language in which they appear. Minn.Stat. § 645.17(2).[2] But, it appears to me, that to

1. The amount of the claimed rebate in the instant case is only $11,362.58. However, the record in the tax court indicates that more than $2 million in rebate claims are pending the outcome of this case.

2. *See also Int'l Trust Co. v. American Loan & Trust Co.*, 62 Minn. 501, 503, 65 N.W. 78, 79 (1895), where Mr. Justice Mitchell stated the rule:

> It is always an unsafe way of construing a statute or contract to divide it, by a process of etymological dissection, into separate words, and then apply to each, thus separated from its context, some particular definition given by lexicographers, and then reconstruct the

apply the *Crown Iron Works'* construction of "sale" would in the context of this refund amendment do just that: it would result in not only ignoring the effective date clause, but also render it superfluous. It would be superfluous because "date of delivery" would be controlling, thus making the clause itself redundant. I remain unpersuaded by the majority's attempt to avoid that conclusion. I find nothing in either the record or the legislative hearings to support the majority's assertion that the refund amendment was contemplated by the legislation to inure to the benefit of any person who, as Color Ad, had long before enactment of the statute committed to the purchase of capital goods for use in Minnesota. Finally, an attempt to reconcile the presumption in Minn.Stat. § 645.17(4) (the presumption that when the legislature uses a word previously defined by the court it intends the same meaning) with that found in Minn.Stat. § 645.17(2) (the presumption that the entire statute be effective and certain) only results in contributing to the uncertainty and ambiguity of the meaning of the statutory language in the refund amendment.

Having concluded the language of the refund amendment is ambiguous, in order to exercise our overall responsibility to construe statutes to effectuate the intention of the legislature, it is proper to refer to contemporaneous legislative history relative to the occasion and necessity for the statute, the circumstances prompting its enactment, and its objective. *See* Minn.Stat. § 645.16 (1986); *Peterson v. Haule*, 304 Minn. 160, 230 N.W.2d 51 (1975).

Reference to the contemporaneous legislative history leaves me with no doubt that the 1984 capital refund program represented one reaction of the legislature to publicly aired contentions in 1983 and 1984 that a "poor business climate" existed in the state, which, some asserted, had contributed, at least in part, to the exodus of some business firms to other states. One real economic disadvantage to businesses located in Minnesota arose from a sales and use tax on capital equipment and certain capital tools which had been imposed at higher rates than were similar taxes in adjoining states. To eradicate this disparity, and as part of its larger program to attempt to stimulate economic development and resulting employment, the legislature sought to provide an incentive to businesses either to locate or to remain in the state.[3]

In this case both Color–Ad and the tax court acknowledge the incentive purpose underlying the refund amendment. Color–Ad does not, nor could it, claim that the orders placed by it for the capital equipment were motivated in any degree by the incentive program, which, of course, hadn't even been proposed at the time the orders in question had been placed. It does, however, assert that an allowance to it of the rebate would comport with what it asserts to be a broader legislative intent to encourage investment in new plant and productive equipment. I would reject that assertion for two reasons. First, as we have repeatedly held, exemptions in tax statutes are exceptions and are, therefore, to be strictly construed.[4] The refund amend-

---

instrument upon the basis of these definitions. An instrument must always be construed as a whole, and the particular meaning to be attached to any word or phrase is usually to be ascertained from the context, the nature of the subject treated of, and the purpose or intention of the parties who executed the contract, or of the body which enacted or framed the statute or constitution.

**3.** In explaining the purpose of the bill engendering the final statute (H.F. 2016), the chairperson of the house tax committee, who also was one of the bill's authors, asserted that many states taxed sales on capital equipment at 4 percent and that the purpose of the bill was to make existing Minnesota business firms competitive,

as well as to remove a deterrence to other concerns from locating in the state. Hearings on H.F. 2016 before the House Committee on Taxes, 73rd Minn.Leg., April 9, 1984. Similar declarations of purpose were made on the same occasion by other representatives on the tax committee. Eventually the provision was incorporated in the Omnibus Tax Bill S.F. 1969 entitled "Economic Development."

**4.** *See, e.g., Ramaley v. City of St. Paul*, 226 Minn. 406, 412, 33 N.W.2d 19, 22–23 (1948); *County of Hennepin v. Honeywell, Inc.*, 297 Minn. 112, 117, 210 N.W.2d 38, 41 (1973); *Abex Corp. v. Comm'r of Taxation*, 295 Minn. 445, 451–52, 207 N.W.2d 37, 41–42 (1973).

ment, though not purporting to grant complete exemption from taxation of sales and purchase of capital goods, does constitute a limitation on the amount of tax ultimately payable and thus is nothing more than a restricted form of tax exemption. *See, e.g., Ramaley v. City of St. Paul,* 226 Minn. 406, 412, 33 N.W.2d 19, 22–23 (1948). Secondly, the contemporaneous history of the legislation demonstrates that while the legislature meant to narrow the comparative discrepancy between taxes payable by Minnesota producers and those payable by business units in surrounding states, it simultaneously was very much aware of the potential revenue loss that would occur as a result of the rebate and accordingly sought to strictly limit it to its incentive purpose. For example, the House Committee on Taxation considered, but rejected, a proposal to set the rebate at three percent. This proposal was rejected because the additional one percent would not likely contribute to the ends sought to be accomplished sufficient to offset the anticipated loss of revenue to the state. For similar reasons, the committee likewise rejected a proposal which, in effect, would, by way of rebate, grant a complete exemption from sales and use tax on capital equipment. *See* Hearings on H.F. 2106, House Committee on Taxation, 73rd Minn.Leg., April 9, 1984. Therefore, I contend that neither applicable statutory rules of construction nor contemporary legislative history lend support to Color–Ad's assertion that the legislature in 1984 harbored any intent that firms in the position of Color–Ad were to be entitled to tax rebates as part of a broader scheme of providing for economic development.

As the majority points out, while the literal wording of Minn.Stat. § 297A.01, subd. 3 (1986) demonstrates that the words "sale" or "purchase" as used in the taxing statute may include the transaction involving a transfer of title, the definition is nonexclusive.[5] To hold, as the tax court and the majority does, that in the context of the refund amendment a "sale" or "pur-

chase" is never consummated until delivery of possession of the goods, as the commissioner asserts, would largely frustrate the obvious legislative purpose designed to provide an incentive to Minnesota producers to invest in new capital equipment to be utilized in operating Minnesota plants. Additionally, such a limited construction, it seems to me, would result in the very quantum of revenue loss about which legislators expressed concern when debating the refund amendment in 1984. Those debates, it seems to me, clearly indicate the concerned legislators had no intention of providing a windfall at the expense of the public revenues to those, who like Color–Ad, in no sense can be deemed to have made capital investments in reliance on the incentive program.

When the legislature made the refund available on "purchases of capital equipment * * * made after May 1, 1984, but not placed in service until June 30, 1984" it intended something specific by including this effective date provision, and likewise providing for a "gap" period. The tax court construed the effective date provision to apply to equipment and special tooling that required "customization and/or shipment," but not to capital equipment not in existence at the time ordered. If I interpret the majority opinion correctly, it reaches essentially the same conclusion. It seems more plausible and reasonable to me that by its structuring of the effective date provision, the legislature was making a limited allowance for other instances where a "gap" period exists between order date and delivery—such as orders for future goods, customized goods, or goods that may take some extended shipment time, while simultaneously limiting anticipated revenue loss by excluding the possibility of windfall claims by those who could not conceivably have relied upon the refund statute in placing orders. Undoubtedly, the desired result could have been accomplished by utilization of more precise language. Nonetheless, I believe such construction com-

---

5. Minn.Stat. § 297A.01, subd. 3 (1986) reads in the pertinent part: "A 'sale' and a 'purchase' includes *but is not limited to* * * * (a) any transfer of title or possession * * * of tangible personal property * * *." (Emphasis supplied.)

ports with not only the aims but also the apprehensions voiced by concerned legislators during appropriate tax committee hearings.

Minn.Stat. § 297A.01, subd. 3, does not limit the construction of the word "purchase" to that of the word "sale." Indeed, in *Crown Iron Works* we focused only on the definition of the word "sale" as used in the context of a statute imposing a tax— not granting an exception. In that connection, and on that occasion, neither explicitly nor impliedly did we attempt to define the word "purchase" as used in that statute. In statutory interpretation the word "purchase" is not necessarily synonymous with that of the word "sale." The meaning of a word derives from the context of the text in which it appears. In other contexts the words "purchase" and "sale" appear to have been inconsistently defined. For example, in tax law "purchase," to entitle a taxpayer to a demolition refund, needs to be neither accompanied by payment of consideration nor delivery. *See, e.g., First Nat'l Bank & Trust Co. of Chickasha v. United States*, 462 F.2d 908, 910 (10th Cir. 1972) (though involving a real estate transaction "purchase," as used in tax statute defined as a binding agreement to pay an agreed price). Likewise, in security law a purchase occurs at a time liability to pay is fixed and actual delivery is unessential. *J.W. Burress, Inc. v. JLG Industries, Inc.*, 491 F.Supp. 15, 18 (W.D.Va.1980). On the other hand "sale" has been defined or construed consistent with the construction we provided in *Crown Iron Works* with respect to time of tax assessment. *See, e.g., Copeland Corp. v. Lindley*, 50 Ohio St.2d 33, 361 N.E.2d 1344, 1346 (1977) (specific statutory wording); *Community Telecasting Serv. v. Johnson*, 220 A.2d 500, 503–04 (Me.1966) (sales specifically defined in tax statute); *Aurora Country Club, Inc. v. Dep't of Revenue*, 50 Ill.App.3d 756, 7 Ill. Dec. 944, 946, 365 N.E.2d 229, 331 (1977) (tax statute specifically defined "sale").

Because the meaning of Minn.Stat. § 297A.15, subd. 5 (1986) appears equivocal and ambiguous; and because the legislative history clearly demonstrates the purpose of the statute was to provide an incentive for acquisition of capital equipment by Minnesota businesses by doing so without unduly jeopardizing state revenues; and because Color–Ad did not rely on the statutory incentive in ordering the capital equipment; and because allowance of the statutory refund in these circumstances would frustrate both concerns the legislature had in mind when enacting the refund program, I would reverse the opinion of the tax court and reinstate the decision of the commissioner.

YETKA, Justice (dissenting).

I join in the dissent of Justice Kelley.

POPOVICH, Justice (dissenting).

I join in the dissent of Justice Kelley.