**NORTHERN STATES POWER
COMPANY, Respondent,**

v.

**COMMISSIONER OF REVENUE,
Relator.**

No. C1–92–2197.

Supreme Court of Minnesota.

Aug. 6, 1993.

Hubert H. Humphrey, III, Atty. Gen., State of Minnesota, Barry R. Greller, Sp. Asst. Atty. Gen., Tax Litigation Div., St. Paul, for relator.

Briggs & Morgan P.A., Jerome A. Geis, John L. Devney, David L. Donlin, St. Paul, for respondent.

GARDEBRING, Justice.

This case arises out of the denial by the Commissioner of Revenue ("Commissioner") of a tax rebate sought by Northern States Power Company ("NSP"). At issue is whether equipment purchased by NSP qualifies for a sales tax refund under Minn. Stat. § 297A.01, subd. 16 (1986) [1] (the "Capital Equipment Statute"). On stipulated facts, the tax court reversed the decision of the Commissioner and authorized the rebate. We affirm.

1. The parties have stipulated that the applicable    law in this matter is Minn.Stat. ch. 297A (1986).

In 1984, NSP [2] was aware that within approximately four years, it would not be able to meet customer demand for electricity. Although it considered building a new power plant in Wisconsin, NSP decided that it was more economical to install new equipment and machinery in existing power plants. Between July 1985 and June 1987, NSP purchased equipment for installation into three of its power plants: the Riverside power plant ("Riverside"), the Black Dog power plant ("Black Dog") and the Holland Wind Turbine Project ("Holland"). In July 1987, NSP filed a Claim for Refund with the Minnesota Department of Revenue ("Department") for this same time period in the amount of approximately $493,000, plus statutory interest. The refund was sought pursuant to Minn.Stat. § 297A.01, subd. 16, which provided a partial rebate of sales and use taxes paid on purchases of "capital equipment" when used for a "physical expansion" of an existing facility. Approximately $286,000 in the claimed refund was for equipment and machinery used at Riverside, $203,000 for equipment and machinery used at Black Dog, and $4,000 at Holland.

In August 1989 the Commissioner issued a proposed audit denying that part of the claim attributable to purchases made for the Riverside and Black Dog plants.[3] After NSP filed a protest, the Commissioner denied the refund, concluding that NSP had purchased replacement equipment within the meaning of the statute because the purchases at issue were for "machinery or equipment performing substantially the same function [*i.e.*, the production of electricity] in an existing facility." Letter from Karen L. Barrett to Roger D. Sandeen of 1/11/90, at 1 (discussing NSP's protest of denial of sales tax refund). NSP timely appealed the Commissioner's order to the tax court. In ruling in favor of NSP, the tax court concluded that although the equipment at issue replaced equipment that performed substantially the same function, it was not purchased in order to replace the retired equipment, but rather to expand production capacity.

At both Riverside and Black Dog, electricity is produced by boilers, turbines and generators. These three components form a "generating unit." A power plant may have more than one generating unit, but each unit operates independently of other units. Each generating unit within NSP's system is grouped into one of three categories depending on its level of use: peaking units, intermediate load units and base load units.[4]

The Riverside Project, which consisted of building a new generating unit (Unit No. 7), took place between December 1984 and July 1987 at a cost of approximately $60 million. Immediately prior to the installation of the new generating unit, the plant used four turbine/generators (Nos. 1, 2, 6, and 8). Turbine/generators Nos. 1, 2 and 6, due to be retired in 1987, were removed from service in 1985, but were left in place inside the plant. The result of the Riverside Project is that Unit No. 7 is able to produce 133 MW, which is 47 MW or 55% more than the combined capacity of turbine/generators Nos. 1, 2 and 6. Unit No. 7 is larger and more efficient than the older units and consequently is used more often than they were to produce electricity. While turbine/generators Nos. 1, 2 and 6 were used as an intermediate load unit, Unit No. 7 is a base load unit.

The Black Dog Project took place between 1984 and 1986 at a cost of approxi-

---

**2.** NSP is a public utility which provides electricity to parts of Minnesota, Wisconsin, Michigan, North Dakota and South Dakota. During the period at issue, of the 42 power plants owned by NSP, 24 were capable of producing no more than 39 million watts or megawatts ("MW") of electricity. Within these plants there are 127 separate generating units. The generating units at issue, therefore, are larger than the majority of NSP's plants.

**3.** The rebate relating to the purchase of the equipment and machinery acquired for the Holland project is not before the court.

**4.** If a unit is used less than 10% of the time over a year's time, it is considered a peaking unit. Intermediate load units are those that are used 10–50% of the time, while base load units are those used over 50% of the time. As the demand for electricity goes up, the more expensive sources of electricity are used.

mately $70 million. This project involved removing an already existing generating unit (Old Unit No. 2) from the Black Dog plant and installing a larger more productive unit (New Unit No. 2). The boiler of New Unit No. 2 uses a new combustion technology known as atmospheric fluidized bed combustion process ("AFBC"). AFBC allows the use of several types of fuel whereas the old boiler required a blend of high sulfur and low sulfur coal. This new technology reduces sulphur dioxide emissions by 40–90%[5] and nitrogen oxide emissions by 70% from the process used in Old Unit No. 2. New Unit No. 2 is capable of producing 122 MW which is 39 MW[6] or 47% more than Old Unit No. 2. New Unit No. 2 is larger and more efficient than Old No. 2. As a result, the newer unit is used as an intermediate load unit, whereas the old unit was used as a peaking unit.

■ This case turns on the meaning of several related statutes. In 1984, the legislature enacted a sales and use tax rebate which reduced the general sales tax rate from 6% to 4% for purchases of capital equipment. 1984 Minn. Laws ch. 502, art. 6, §§ 2, 4, and 7. The 2% rebate was obtained by paying the normal 6% rate on the equipment and then making an application to the Commissioner for a refund. Three statutory provisions were enacted to establish the rebate and the process for obtaining it: Minn.Stat. § 297A.01, subd. 16 (1986), the Capital Equipment Statute which defined "capital equipment"; Minn. Stat § 297A.02, subd. 2 (1986) which extended a 4% sales tax rate to "capital equipment"; and Minn.Stat. § 297A.15, subd. 5 (1986) which established the procedure for receiving a refund under these provisions. The Capital Equipment Statute states in relevant part:

> Capital equipment means machinery and equipment and the materials and supplies necessary to construct or install the machinery or equipment. To qualify under this definition the capital equipment must be used by the purchaser * * * for manufacturing * * * a product to be sold at retail and must be used for the establishment of a new or the physical expansion of an existing manufacturing * * * facility in the state.[7]

Minn.Stat. § 297A.01, subd. 16 (1986). This provision is subject to an exception for replacement equipment.

> Capital equipment does not include (1) machinery or equipment purchased or leased to replace machinery or equipment performing substantially the same function in an existing facility * * *.

*Id.*

The legislature also enacted another, separate sales tax rebate program in 1985, the "Distressed County Statute," which allowed for a complete rebate of the 6% sales tax for "capital equipment" purchased for use in an economically distressed county. 1985 Minn.Laws, 1st Sp. Sess. ch. 14, art. 8, § 18. That statute states in part:

> Purchase or use of equipment for use in an existing plant qualifies under this section *and under section 297A.01, subdivision 16*, as an expansion if either the production capacity of the plant is increased by at least 20 percent as a result or if the total capital investments made within a 12–month period exceed $25,-000,000.

Minn.Stat. § 297A.257, subd. 2 (1986) (emphasis added).

---

**5.** Sulphur dioxide emissions are believed to cause acid rain. Additionally, as a result of pollution regulations, Old Unit No. 2's capacity was reduced from 100 MW to 83 MW in 1975 when it began burning a combination of low and high sulfur coal which produced substantial sulphur dioxide emissions.

**6.** Twenty-four of NSP's forty-two plants are smaller than the *increase* in production at either Riverside or Black Dog. *See supra* n. 2.

**7.** We concur with the tax court's finding No. 10 that for the purposes of this statute, the boiler, turbine and generator at both Riverside and Black dog:
 (a) constitute "machinery and equipment and the materials and supplies necessary to construct or install the machinery and equipment"; (b) were purchased by NSP as a "purchaser"; [and] (c) are used by NSP in "manufacturing" a "product" in Minnesota which is "sold at retail" * * *.
 Tax Ct.Op. at 4.

The issue in this case is whether the purchase of equipment which replaces old equipment, but which also expands the production capacity of a facility, is eligible for the rebate, and more specifically, whether the equipment purchased by NSP for use in existing power plants qualified for a partial sales tax refund as "capital equipment" under the Capital Equipment Statute. NSP can prevail either if its investments at Black Dog and Riverside qualify as "capital equipment" under the general provisions of Minn.Stat. § 297A.01, subd. 16 (1986), or if they come within the meaning of the modification in the Distressed County Statute, Minn.Stat. § 297A.257, subd. 2.

Citing Justice Kelley's dissenting opinion in *Color–Ad Packaging v. Commissioner of Revenue*, 428 N.W.2d 806, 811 (Minn. 1988), NSP argues that because the intent of the statute [8] was to provide economic incentives to businesses in Minnesota, the purchases it made fall within the ambit of the general statute. While it is true that the equipment purchased by NSP performs "substantially the same function" as the old equipment, i.e., the generation of electricity, it is equally true that it also represents a very significant "expansion of an existing manufacturing facility in the state." Given the economic development policy implicit in the statute, NSP argues that it would be ludicrous to make the rebate available to those business entities which enter a new line of business (so the equipment does not perform the same "function"), but not to those Minnesota businesses which expand their ongoing business activities. The Commissioner responds by arguing that under the wording of the statute, the legislature meant to exclude all claims for replacement equipment, even if production capacity was increased. The Commissioner believes that the statute is meant to promote expansion, not replacement and that what NSP has done is only to replace existing equipment. The Commissioner asserts that the function of both the old and new equipment is to generate electricity, and argues that an increase in capacity of the new equipment

does not change its essential "function". Thus, she urges us to reverse the tax court because the investments made by NSP are within the exclusion for replacement equipment, Minn.Stat. § 297A.01, subd. 16 (1986).

We think that the Commissioner's interpretation of "function" is far too narrow. We do not believe that the legislature intended that only those companies that develop new product lines would be eligible for the refund. If a manufacturer of a single product line significantly increases production capacity, the effects intended by the legislature have been achieved: increased revenue to the state resulting from an increased number of jobs. The statute was meant to encourage that type of activity in all businesses, not just businesses that expand into different product lines.

■ Therefore, we hold that equipment purchased in order to significantly expand production capacity is eligible for the sales tax refund as "capital equipment" under the Capital Equipment Statute, Minn.Stat. § 297A.01, subd. 16 (1986).

■ As an alternative basis for our decision, we note that the Distressed County Statute, Minn.Stat. § 297A.257, subd. 2 (1986), made specific reference to the definition of "capital equipment" within the Capital Equipment Statute. The tax court held that NSP met the requirements for "expansion" under the Distressed Counties Statute, and consequently, for "physical expansion" under the Capital Equipment Statute, and concluded that the Distressed Counties Statute expressly amended the Capital Equipment Statute. We agree.

A fundamental canon of statutory interpretation is that a law should be interpreted in such a way as to give effect to all of its provisions. Minn.Stat. § 645.16 (1992). The tax court observed that the Commissioner was unable to satisfactorily explain why the reference to the full citation of the Capital Equipment Statute was present in the Distressed County Statute. We agree with the tax court's conclusions that the reference to the Capital Equipment Statute

8. Both parties agree the statute is ambiguous, and the tax court so found.

within the Distressed County Statute evinces the intent of the legislature to apply the definition of "expansion" found in the Distressed County Statute as a modification of the definition of the term "capital equipment" found in the Capital Equipment Statute.[9]

We fail to see the purpose of juxtaposing the full citation to the Capital Equipment Statute and the definition of "expansion" found in the Distressed County Statute unless that definition were meant to apply to the Capital Equipment Statute.

Therefore, we hold that the definition of the term "expansion" set forth in the Distressed County Statute applies to define the term "physical expansion" set forth in the Capital Equipment Statute and that NSP's purchases qualify for the partial sales tax rebate as "capital equipment" under Minn.Stat. § 297A.01, subd. 16 (1986).

Affirmed.

---

9. In its opinion, the tax court stated:

The Commissioner argues that this definition of expansion [*i.e.,* that found in the Distressed County Statute] is not applicable to the 2% refund allowable for expansions under the Capital Equipment Statute. The Commissioner fails to explain however, why the reference to the Capital Equipment Statute was included in the Distressed County Statute if it was not intended to be a minimum definition, a "safe harbor" or "bright line test" for physical expansion. The application of the expansion tests contained in the Distressed County Statute to the Capital Equipment Statute must have some meaning. The tests for what constitutes expansion apply to the Capital Equipment Statute as well as to the Distressed County Statute. The purpose of the Distressed County Statute could have been achieved without the reference to the Capital Equipment Statute or by limiting the definition of expansion to the Distressed County Statute.

The Distressed County Statute clearly indicates the Legislature's intent to amend the Capital Equipment Statute. The Distressed County Statute expressly referred to the earlier enacted Capital Equipment Statute by stating that the expansion tests *also* apply to the Capital Equipment Statute. Therefore, the Capital Equipment Statute was expressly amended by the Distressed County Statute to include the expansion tests of the latter. Tax Ct.Op. at 32 (emphasis in original).